

Daniel Cavic- Plaintiff
611 N. Rose Dr. Apt. F213
Placentia , Ca 92870
Cell 714-931-7707
Email : cavic.danny@yahoo.com

IFP Submitted

FILED
CLERK, U.S. DISTRICT COURT

MAR 1 2 2024

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DANIEL CAVIC,

Plaintiff,

vs.

REPUBLICS OF MONTENEGRO,
BOSNIA AND HERZEGOVINA,
NORTH MACEDONIA, AND
SLOVENIA

Defendant

Case No.: 8:24-CV-00526-SVW (KESx)

COMPLAINT FOR:
BREACH OF CONTRACT
FRAUD
EMOTIONAL DISTRES
PUNITIVE DAMAGES

Daniel Cavic (the "Plaintiff" or "Mr. Cavic") brings this action for breach of Succession agreement of former Yugoslavia against the Republics of Montenegro, Bosnia and Herzegovina, North Macedonia, and Slovenia and DOES 1-10 (collectively, the "Defendants" or the "Republics").

Original Complaint has been previously Dismissed Without Prejudice ,by Judge FRED W. SLAUGHTER on Feb. 7. 2024, Case no. 8-23-cv-01308

This Complaint against 4 Republics is to collect a Judgment against Yugobanka, dated Nov. 15. 2019, from the Superior Court of Santa Ana, Ca, for the original amount of $738,722.23, plus interests for 5 years, till Nov. 15. 2024, to be adjusted at the day of payment. Note, all Defendants are the actual owners of Yugobanka's assets. Total amount is $1,108,083.34, plus attorneys and court fees.

COMPLAINT FOR: BREACH OF CONTRACT FRAUD EMOTIONAL DISTRESPUNITIVE DAMAGES - 1

## SUBJECT MATTER JURISDICTION AND VENUE

This is an action for enforcing an international agreement, arising under the 2001 Succession Agreement of Former Yugoslavia and involving a 28 U.S.Code §1605 (a) (1) (waver of immunity), 28 U.S.Code §1605 (a) (4) (property acquired by succession), and 28 U.S.Code §1605 (a) (5) (los of property caused by tortious act or omission) exceptions, based on Yugoslavia's Successor States accepting Yugoslavia's assets in U.S. , and U.S. Court Jurisdiction in New York case no. 400649/12, including Yugobanka's assets, about $200 Million , shared by all Republics and refusing to fulfill the liabilities that come with it, as outlined in Annex C of the Succession Agreement. Based on all presented arguments , Subject Matter Jurisdiction and Immunity acts are MOOT.

1. This Court has subject matter jurisdiction in this action pursuant to 28 U.S.Code §1605 (a) (1) (waver of immunity), 28 U.S.Code §1605 (a) (4) (exception to jurisdictional immunity of a foreign state), 28 U.S.Code §1605 (a) (5) (loss of property caused by tortious act or omission), 28 U.S.Code § 1330 (District Court has original jurisdiction), and 28 U.S.Code § 1331 (Federal question).

2. As per Supreme Court decision dated May 18. 2023, in Turkiye Halk Bankasi vs United States, holding that the Foreign Sovereign Immunity Act ( FSIA) does not provide foreign states immunity from Criminal Prosecution, or by Waived Immunity Law. In this case, based on Fraud , Criminal Law and by Waived Immunity Law, this is proper Jurisdiction .

COMPLAINT FOR: BREACH OF CONTRACT FRAUD EMOTIONAL DISTRESPUNITIVE DAMAGES - 2

3. Subject Matter Jurisdiction issue has been waived 3 times by Defendants. First time as per 2001 Succession agreement, signed by all former Yugoslav Republics.

Second time in 2016, as per New York case no. 400649/12, where all 6 Republics have waived Subject Matter Jurisdiction and sovereign immunity, by accepting U.S. Jurisdiction and share of about 200 million, as per 2001 Agreement, as per attached Exhibit C.

Third time waived Jurisdiction and Immunity as per Case no. 30-2019-01055993, from Superior Court in Santa Ana , Ca, where I got the Judgment against Yugobanka for about $738,722. Note, Yugobanka is the Asset of former Yugoslavia, and all 6 Republics are the Owners of Yugobanka assets.

Based on all 3 Waived Jurisdiction and Immunity Acts, these Acts are considered as MOOT issues.

4. Venue is proper in the Central District of California pursuant to 28 U.S. Code § 1391 (c) (2) and (3) because Plaintiff is a resident of Orange County California and Defendants have accepted and waived Jurisdiction and Immunity acts.

COMPLAINT FOR: BREACH OF CONTRACT FRAUD EMOTIONAL DISTRESPUNITIVE DAMAGES - 3

## THE FOREIGN SOVEREIGN IMMUNITY ACT

As per previous arguments about Proper Jurisdiction law, same arguments apply here for Immunity Law as well. It is waived 3 times and it is MOOT. Further arguments and Exhibits will prove my arguments. This is not an Original Court filing, this is just a continuation of New York and Santa Ana Court Rulings.

## FACTUAL BACKGROUND

5. Daniel Cavic incorporates paragraphs 1 through 3 of the Complaint as if fully set forth herein.

6. After former Yugoslavia's breakup, the 2001 Succession Agreement of Former Yugoslavia (hereafter the "Succession Agreement") names six successor states to its assets and liabilities: the Republics of Montenegro, Serbia, Bosnia and Herzegovina, North Macedonia, Croatia, and Slovenia (Collectively, "Successor States"). Said Successor States were distributed all of former Yugoslavia's assets and liabilities.

COMPLAINT FOR: BREACH OF CONTRACT FRAUD EMOTIONAL DISTRESPUNITIVE DAMAGES - 4

7. As per the Succession Agreement Annex C, former Yugoslavia's assets and liabilities were divided as follows: Slovenia 16.39 %, Macedonia 5.40%, and Bosnia and Hercegovina 13.20%, Croatia 28.49%, Federal Republic of Yugoslavia (which became Serbia and Montenegro in 2006) 36.52%, (Collectively, the "Rates"). Full historical details are available at Bank of N.Y. v Yugoimport SDPR J.P., 780 F.Supp.2d 16 344, 346-49 (S.D.N.Y. 2011).

8. Prior to Yugoslavia's breakup, Plaintiff had deposits in Yugobanka, New York Agency (hereafter "Yugobanka").

9. After Yugoslavia's breakup and Yugobanka's liquidation, Yugobanka's assets and liabilities, including Plaintiff's deposits, were distributed to the Successor States, as per the Succession Agreement.

10. Pursuant Yugobanka's liquidation, New York's District Court named Daniel Cavic as 1st creditor in Yugobanka's liquidation case.

11. Plaintiff filled, and got a Judgment, against Yugobanka – he was awarded his initial deposit of thirty-one thousand, two hundred seventy-three US dollars ($31,273), plus 10% interest compounded annually, plus attorney fees, totaling $1,108, as later demonstrated. See Case NO. 30-2019-01055993-CU-BC-CJC.

COMPLAINT FOR: BREACH OF CONTRACT FRAUD EMOTIONAL DISTRESPUNITIVE DAMAGES - 5

12. As such the Successor States each now owe Plaintiff's original deposits in Yugobanka, plus interest, as per the Rates, according to the Succession Agreement – the Republics are liable jointly and severally for the $1,108,083.34, plus Attorney and Court fees, due to Plaintiff.

13. The Successor States have refused to pay Plaintiff his due share, thus breaching the Succession Agreement.

14. Full historical details are available at Bank of N.Y. v. Yugoimport SDPR J.P., 780 F.Supp.2d 16 344, 346-49 (S.D.N.Y. 2011).

15. This case comes to us pursuant the violent breakup of the SFRY. As the communist state weakened in the 1990s, the tension in the region turned to decades of bloodshed.

16. Upon US and NATO military marching in in 1995, the Dayton Accords was signed. Though the Dayton Accords bettered things in the region, they did not resolve everything that needed resolving — distribution of financial assets of the SFRY (former Yugoslavia) had not been addressed and thus armed conflict continued.

17. The Succession Agreement was born in 2001. Annex C addresses financial assets. Article 5 of said Annex C clarifies that SFRY's foreign financial assets, and needless to say liabilities, including funds held in foreign banks

COMPLAINT FOR: BREACH OF CONTRACT FRAUD EMOTIONAL DISTRESPUNITIVE DAMAGES - 6

such as Mr. Cavic's funds held in Yugobanka, New York Agency, "shall be distributed" to successor.

18. The republics willfully signed it in order to receive SFRY's assets (and of course liabilities). It is undisputed that those three republics have received assets of SFRY's assets through Yugobanka's liquidation, including Mr. Cavic's share, and it is also undisputed they have also inherited the obligation to honor Mr. Cavic's deposit refund, plus interest, penalties, etc (as clearly stated above and as clearly proved and demonstrated in Exhibits).

## GOVERNING LAW

19. Daniel Cavic incorporates paragraphs 1 through 18 of the Complaint as if fully set forth herein.

20. Given the above-mentioned background, it is unquestionably clear that the International Succession Agreement from year 2001, should be consulted regarding this case. More specifically, Annex C of the Succession Agreement speaks directly, and explicitly, to the situation at hand, Republics of Serbia, Monte Negro, Slovenia, North Macedonia (former Macedonia) and Republic of Bosnia and Hercegovina, are recipients of the Yugobanka's

COMPLAINT FOR: BREACH OF CONTRACT FRAUD EMOTIONAL DISTRESPUNITIVE DAMAGES - 7

liquidation funds, and they are to be the ones to satisfy Yugobanka's liquidation obligations, such as Mr. Cavic/D.C. Precision Co's deposits.

21. Since said Annex of said Succession Agreement is precisely on point and is indeed specifically drafted for this particular situation, as it is expressly confirmed by Coffi Annan, the President of the United Nations, then it is in fact this specific International Agreement that must be honored, fulfilled, and used as governing law in this particular situation.

22. This Succession Agreement states that all foreign assets and liabilities shall be shared by the Republics at the following percentages regarding all financial assets and liabilities: Slovenia 16.39 %, Macedonia 5.40%, and Bosnia and Hercegovina 13.20%, Croatia 28.49%, Federal Republic of Yugoslavia (which became Serbia and Montenegro in 2006) 36.52%. *See* Exhibit 1.

23. Yugobanka's case is considered as a FOREIGN assets and liabilities, which is the only condition required by the Agreement. Yugobanka's New York case is just one, out of several hundred other cases around the world, where assets were found.

24. The Republics have Accepted Assets from former Yugoslavia and Yugobanka, New York Agency, and yet failed to satisfy Liabilities to Creditors, such as Daniel Cavic.

COMPLAINT FOR: BREACH OF CONTRACT FRAUD EMOTIONAL DISTRESPUNITIVE DAMAGES - 8

25. The Succession Agreement of 2001 recognizes Republics as a successor state to the Socialist Federal Republic of Yugoslavia (SFRY). *See* Succession Agreement, 41 I.L.M. at 3 within Exhibit 1. The on-point precedent Yugoimport v. Republic of Croatia, Republic of Slovenia, No. 11-1990 (2d Cir. 2014) clearly spells it out: "Annexes C [of the Succession Agreement of 2001] deals with the division of "financial assets and liabilities." *See* Exhibit 2.

26. Article 1 of Annex C defines the financial assets of the SFRY to include "accounts and other financial assets in the name of the SFRY Federal Government Departments and Agencies." Id. At 25". *See* Annex C within Exhibit 1.

27. This Succession Agreement was approved by the United Nations, signed by the President of the United Nations, Mr. Cofi Annan, and signed by the Foreign Ministers of each of the Successor States.

28. This Succession Agreement, along with the pass-through assets and liabilities, is thus de facto binding today upon the Republics.

29. As per said Succession Agreement, the Republics inherited SFRY's assets and liabilities, including foreign assets as in Yugobanka's $200 million of liquidated assets and liabilities, as directed by Annex C of the Succession Agreement of 2001. *See* Annex C within Exhibit 1.

30. The Republics are the sole successors of Yugobanka. There exists, and at all times relevant to thereto there existed, a unity of interests and ownership between the Republics and Yugobanka's liquidation such that any individuality and separateness between them never exised or has ceased to exist, and the Republics are the alter ego of Yugobanka's liquidated assets. To adhere to the fiction of the existence of Yugobanka's liquidated assets as separate and distinct from the Republics would permit an abuse of sovereign Privileges, and would promote injustice.

31. As such, the Republics and Yugobanka enjoyed the SFRY's integrated resources with a single business purpose to satisfy said liabilities. Whereas Yugobanka is now liquidated, the Republics dominate finances of said assets.

32. Since part of Yugobanka's Assets included Plaintiff's bank deposits and foreign assets, said deposits are therefore part of Yugobanka's liabilities. Consequentially, Republics liabilities and obligations de facto include Plaintiff's deposits/foreign assets as per Annex C.

33. In fact, Plaintiff Daniel Cavic, aka D.C. Precision Co, is the first creditor on the List of Accepted and Rejected Claims and Accounts Payable pursuant Yugobanka's Liquidation. *See* Exhibit 3.

COMPLAINT FOR: BREACH OF CONTRACT FRAUD EMOTIONAL DISTRESPUNITIVE DAMAGES - 10

34. Therefore, Plaintiff's right to be paid is undisputable, just as it is undisputable that the Republics inherited Yugoslavian's assets and the obligation to pay Plaintiff his due amount.

35. Thus, Republics are to be joint as Judgment debtor in this case and required to pay their obligation to Plaintiff.

36. Though Plaintiff has received seven thousand, one hundred and thirteen US dollars ($7,113) prior to this date, he is still owed seven hundred and thirty-eight thousand, seven hundred and twenty-two dollars and twenty three cents ($738,722.23), as per November 15, 2019 judgment. There is ten percent (10%) interest per year, equating to $203 per day, for 4 years until projected resolution date of November 15, 2023, totaling one million, thirty-four thousand, two hundred and eleven dollars and twelve cents ($1,034,211.12). Plus thirty thousand dollars ($30,000) in attorney and court fees for 4 year, totaling the sum of one million, sixty four thousand, two hundred and eleven dollars and twelve cents ($1,064,211.12). *See* Exhibit 4.

37. Though the Republics may raise FSIA, 28 U.S.Code §§ 1330, 1332, 1391(f), 1441(d), 1602- 1611, which grants foreign sovereigns general immunity from suit in the U.S., id. § 1604, there are several exceptions to such immunity. Id. §§ 1605- 1607.

COMPLAINT FOR: BREACH OF CONTRACT FRAUD EMOTIONAL DISTRESPUNITIVE DAMAGES - 11

38. Where an exception applies, district courts have original jurisdiction over the action, id. § 1330, and if the action was brought in state court, the foreign sovereign may remove it to the district court of the district encompassing the state in which the action is pending. Id. § 1441(d).

39. This case clearly falls within 28 U.S.Code §1605 (a) (4), 1605 (a) (1), and 28 U.S.Code §1605 (a) (5) exceptions.

40. Exception 1605 (a) (4) states "A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case— in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue."

41. As the court shall notice, and as it is explicitly outlined in the Succession Agreement, this case does indeed address "rights in property in the United States" — Plaintiff's bank account deposits/foreign assets as per Annex C in the New York branch of Yugobanka, "acquired by succession or gift" — as it is amply demonstrated in this motion via the Succession Agreement Annex C, that Republics did indeed acquire $200 Million by succession Plaintiff's deposits/foreign assets as per Annex C.

42. 28 U.S.Code §1605 (a) (1) states that if a foreign state has waved immunity, then that immunity remains waived. The Republics have indeed waved their

COMPLAINT FOR: BREACH OF CONTRACT FRAUD EMOTIONAL DISTRESPUNITIVE DAMAGES - 12

immunity in regard to financial assets and liabilities upon agreement with, and signing, of Annex C and upon acceptance of former Yugoslavia's funds.

43. According to 28 U.S.Code §1605 (a) (5), a foreign state shall not be immune if money damages are sought against said foreign state for loss of property (Plaintiff's bank deposits), among other things, occurring in the Unite States (as in this case where the loss of property occurred in New York's branch of Yugobanka), and caused by the tortious act or omission of that foreign state (as it is the case here since the Republics have accepted the assets, however have omitted fulfilling the liabilities arising from the acceptance of said assets).

44. Consequently, Republics are indeed subject to this court's jurisdiction in this given matter and should be added to the default judgment at hand. Furthermore, Section 1606, therefore provides that a foreign sovereign "shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606.

45. In Yugoimport v. Republic of Croatia, Republic of Slovenia, No. 11-1990 (2d Cir. 2014), the New York court so clearly and elegantly explains the background, reason, and consequently the importance of following the Succession Agreement that we will reference said NY court ruling hereafter. Also See Exhibit 2. Said New York court honored the Succession

COMPLAINT FOR: BREACH OF CONTRACT FRAUD EMOTIONAL DISTRESPUNITIVE DAMAGES - 13

Agreement Annex C and even leaned upon Austria's Case Law to help further clarify Annex C. As such said New York case has become a precedent in this situation and as such, Republics are to be included as a judgement debtor in this case.

46. It is absolutely self-evident that great injustice will result if the Republics are allowed to take $200 Million of SFRYs assets through Yugobanka's Liquidation, as they already have, without being obliged to honor SFRY's liabilities, towards Plaintiff in this case. As such, the prior judgment should be enforced against the Republics and each Republic is to pay their due share of what is owed to Mr. Cavic.

## FIRST CLAIM OF RELIEF

## BREACH OF CONTRACT -- 2001 SUCCESSION AGREEMENT OF FORMER YUGOSLAVIA

## AGAINST ALL DEFENDANTS

47. Daniel Cavic incorporates paragraphs 1 through 46 of the Complaint as if fully set forth herein.

48. The four elements of breach of agreement are: 1) a valid agreement, 2) performance, 3) breach, and 4) damages.

49. <u>Valid Agreement</u>: As demonstrated above, the 2001 Succession Agreement of Former Yugoslavia is a valid agreement, approved, signed, and executed by all of the Republics. It is an internationally recognized valid agreement.

50. <u>Performance</u>: Plaintiff fulfilled his essential obligations qualifying him to be part of this Succession Agreement by depositing money in Yugobanka prior to Yugoslavia's breakup and by the Republics accepting Yugobanka's assets as part of Yugobanka's assets disbursements.

51. <u>Breach</u>: The Republics have not honored the liability side of the Succession Agreement, thus breaching said agreement.

52. <u>Damages</u>: This breach has cost Plaintiff time; court and lawyer fees; forgone investments; the use of money he has needed for himself and his family; undue stress; and emotional turmoil to say the least.

53. All the elements of breach of contract have been met.

54. Defendants' disregard and continued and obvious disdain towards their obligation to the liabilities they have inherited alongside the assets pursuant the Succession Agreement has been knowing and intentional with the intent to defraud Plaintiff of the money due to him.

55. Unless compelled to pay Mr. Cavic's due amount, Defendants will continue to enjoy former Yugoslavia's assets without honoring former Yugoslavia's liabilities and will continue to robe Mr. Cavic, and other Yugobanka

COMPLAINT FOR: BREACH OF CONTRACT FRAUD EMOTIONAL DISTRESPUNITIVE DAMAGES - 15

creditors, of the livelihood they had deposited in Yugobanks, thereby deceiving the creditors and causing Mr. Cavic to suffer immediate, irreparable, and long-term financial injury.

## FRAUD CAUSE OF ACTION, AGAINST ALL DEFENDANTS

49. Plaintiff incorporates all paragraphs from 1 to 48. Defendants have committed Fraud, by not paying Plaintiff's Original Deposit from year 1991, plus interests. Plaintiff asks for $1,000.000.00 damages from all defendants, for fraud, plus previous Judgment of $1,108,083.34 from 2019 Judgment.

## EMOTIONAL DISTRESS CAUSE OF ACTION , AGAINST ALL DEFENDANTS

50. Plaintiff incorporates all paragraphs from 1 to 49, for emotional distress from year 1991 to present, and asking for another $1,000.000.00 on top of Breach of Contract and Fraud.

## PUNITIVE DAMAGES AGAINST REPUBLIC OF SLOVENIA, ONLY

51. Plaintiff incorporates all paragraphs from 1 to 50, against Republic of Slovenia only, because Slovenia is financially the strongest Republic and because Slovenian Court have Denied my Complaint , against Slovenia,

COMPLAINT FOR: BREACH OF CONTRACT FRAUD EMOTIONAL DISTRESPUNITIVE DAMAGES - 16

filed in Ljubljana Court, in Slovenia, in 2021. Slovenia have confirmed their disrespect to Hague Convention Service Process, disrespect to U.S. Courts and disrespect to Plaintiff Daniel Cavic, as Creditor in New York case, as well as to Superior Court in Santa Ana, Ca.

52. Plaintiff asks for Punitive Damages to be 3 times the amount of all other damages, as per California Law.

# PRAYER

WHEREFORE, Plaintiff Daniel Cavic prays for judgment as follows:

1. For Breach of Contract monetary damages in an amount according to proof at trial and as permitted by law, but no less than $1,108,083.34

2. For Fraud in an amount according to proof at trial and as permitted by law, but no less than $1,000,000.00

3. For Emotional Distress in the amount of $1,000,000.00

4. For punitive damages, 3 times of all previous damages. Slovenia only.

COMPLAINT FOR: BREACH OF CONTRACT FRAUD EMOTIONAL DISTRESPUNITIVE DAMAGES - 17

5. For attorney's fees $50,000.00

6. For costs; and

7. For such other and further relief as the Court deems just and proper.

SERVICE

As per Hague Convention, the Republic of Montenegro was served at:

Ministry of Foreign Affairs
Department of Multilateral Relations
Stanka Dragojevica 2
81000 PODGORICA
Montenegro

And as per diplomatic, the Republic of Montenegro was served at:

1610 New Hampshire Avenue,
Northwest, Washington, D.C 20009

As per Hague Convention, the Republic of Bosnia and Herzegoniva was served at:

Ministry of Foreign Affairs of Bosnia and Herzegovina
Musala St. 2
71 000 SARAJEVO

And as per diplomatic, the Republic of Bosnia and Herzegovina was served at:

COMPLAINT FOR: BREACH OF CONTRACT FRAUD EMOTIONAL DISTRESPUNITIVE DAMAGES - 18

2109 E St NW,
Washington, DC 20037

As per Hague Convention, the Republic of North Macedonia was served at:

Ministry of Foreign Affairs
International Law Directorate
Filip II Makedonski 7
1000 Skopje
Republic of North Macedonia

And as per diplomatic, the Republic of North Macedonia was served at:

2129 Wyoming Ave NW,
Washington, DC 20008

As per Hague Convention, the Republic of Slovenia was served at:

Ministry of Justice
c/o Mr. Jurij Mesec, Secretary
Župančičeva 3
1000 Ljubljana
Slovenia

And as per diplomatic, the Republic of Slovenia was served at:

2410 California St NW,
Washington, DC 20008

Dated this March, 11.2024

By Plaintiff : Daniel Cavic

COMPLAINT FOR: BREACH OF CONTRACT FRAUD EMOTIONAL DISTRESPUNITIVE DAMAGES - 19

EXHIBIT LIST

1.  SUCCESSION AGREEMENT- Exh. A
2.  JUDGMENT , YEAR  2019, SUPERIOR COURT OF SANTA ANA, CALIFORNIA, Exh. B
3.  SUPREME COURT OF THE STATE OF NEW YORK, Exh. C
4.  CENTRAL DISTRICT COURT RULING, FEB. 7. 2024, Exh. D
5.  COURT RULINGS FROM SLOVENIA, Exh. E

# AGREEMENT ON SUCCESSION ISSUES, 2001

*EXH. A*



## UNITED NATIONS
2001

AGREEMENT ON SUCCESSION ISSUES


Bosnia and Herzegovina, the Republic of Croatia, the Republic of Macedonia, the Republic of Slovenia and the Federal Republic of Yugoslavia, being in sovereign equality the five successor States to the former Socialist Federal Republic of Yugoslavia,

Mindful of the need, in the interests of all successor States and their citizens and in the interests of stability in the region and their mutual good relations, to resolve questions of State succession arising upon the break-up of the former Socialist Federal Republic of Yugoslavia,

Having held discussions and negotiations under the auspices of the International Conference on Former Yugoslavia and the High Representative with a view to identifying and determining the equitable distribution amongst themselves of rights, obligations, assets and liabilities of the former Socialist Federal Republic of Yugoslavia,

Acting within the framework of the mandate given to the High Representative by the Decision of the Peace Implementation Conference held in London, 8-9 December 1995, and in the light of agreements between the successor States and the Declarations adopted by the Peace Implementation Council and its Steering Board,

Bearing in mind the acknowledgement by the Security Council in its Resolution 1022(1995) of the desirability of a consensual solution to outstanding succession issues,

Confirming the decision reached on 10 April 2001 concerning the distribution of the former SFRY's assets held at the Bank for International Settlements (the text of which decision is appended to this Agreement),

Demonstrating their readiness to co-operate in resolving outstanding succession issues in accordance with international law,

Have agreed as follows:

Article 1

For the purposes of this Agreement "SFRY" means the former Socialist Federal Republic of Yugoslavia.

Article 2

Each successor State acknowledges the principle that it must at all times take the necessary measures to prevent loss, damage or destruction to State archives, State property and assets of the SFRY in which, in accordance with the provisions of this Agreement, one or more of the other successor States have an interest.

Article 3

The Annexes listed below set out the terms on which the subject matter of each Annex is settled:

Annex A: Movable and immovable property;

Annex B: Diplomatic and consular properties;

Annex C: Financial assets and liabilities (other than those dealt with in the Appendix to this Agreement);

Annex D: Archives;

Annex E: Pensions;

Annex F: Other rights, interests, and liabilities;

Annex G: Private property and acquired rights.

Article 4

(1)    A Standing Joint Committee of senior representatives of each successor State, who may be assisted by experts, is hereby established.

(2)    This Committee shall have as its principal tasks the monitoring of the effective implementation of this Agreement and serving as a forum in which issues arising in the course of its implementation may be discussed. The Committee may as necessary make appropriate recommendations to the Governments of the successor States.

(3)    The first formal meeting of the Standing Joint Committee shall be convened, at the initiative of the Government of the Republic of Macedonia, within two months of the entry into force of this Agreement. The Committee may meet informally, and on a provisional basis, at any times convenient to the successor States after the signature of this Agreement.

(4)    The Committee shall establish its own rules of procedure.

Article 5

(1)    Differences which may arise over the interpretation and application of this Agreement shall, in the first place, be resolved in discussion among the States concerned.

(2)    If the differences cannot be resolved in such discussions within one month of the first communication in the discussion the States concerned shall either

(a) refer the matter to an independent person of their choice, with a view to obtaining a speedy and authoritative determination of the matter which shall be respected and which may, as appropriate, indicate specific time-limits for actions to be taken; or

(b) refer the matter to the Standing Joint Committee established by Article 4 of this Agreement for resolution.

(3) Differences which may arise in practice over the interpretation of the terms used in this Agreement or in any subsequent agreement called for in implementation of the Annexes to this Agreement may, additionally, be referred at the initiative of any State concerned to binding expert solution, conducted by a single expert (who shall not be a national of any party to this Agreement) to be appointed by agreement between the parties in dispute or, in the absence of agreement, by the President of the Court of Conciliation and Arbitration within the OSCE. The expert shall determine all questions of procedure, after consulting the parties seeking such expert solution if the expert considers it appropriate to do so, with the firm intention of securing a speedy and effective resolution of the difference.

(4) The procedure provided for in paragraph (3) of this Article shall be strictly limited to the interpretation of terms used in the agreements in question and shall in no circumstances permit the expert to determine the practical application of any of those agreements. In particular the procedure referred to shall not apply to

(a) The Appendix to this Agreement;
(b) Articles 1, 3 and 4 of Annex B;
(c) Articles 4 and 5(1) of Annex C;
(d) Article 6 of Annex D.

(5)    Nothing in the preceding paragraphs of this Article shall affect the rights or obligations of the Parties to the present Agreement under any provision in force binding them with regard to the settlement of disputes.

## Article 6

The Annexes to this Agreement and the Appendices to the Agreement and Annexes are an integral part of the Agreement.

## Article 7

This Agreement, together with any subsequent agreements called for in implementation of the Annexes to this Agreement, finally settles the mutual rights and obligations of the successor States in respect of succession issues covered by this Agreement. The fact that it does not deal with certain other non-succession matters is without prejudice to the rights and obligations of the States parties to this Agreement in relation to those other matters.

## Article 8

Each successor State, on the basis of reciprocity, shall take the necessary measures in accordance with its internal law to ensure that the provisions of this Agreement are recognised and effective in its courts, administrative tribunals and agencies, and that the other successor States and their nationals have access to those courts, tribunals and agencies to secure the implementation of this Agreement.

## Article 9

This Agreement shall be implemented by the successor States in good faith in conformity with the Charter of the United Nations and in accordance with international law.

<u>Article 10</u>

No reservations may be made to this Agreement.

<u>Article 11</u>

(1)   This Agreement shall be subject to ratification.

(2)   Instruments of ratification shall be lodged as soon as possible with the Depositary identified in Article 13 of this Agreement. The Depositary shall inform the successor States and the Office of the High Representative of the date of deposit of each instrument of ratification.

<u>Article 12</u>

(1)   This Agreement shall enter into force thirty days after the deposit of the fifth instrument of ratification. The Depositary shall notify the successor States, and the Office of the High Representative, of the date of entry into force.

(2)   Notwithstanding paragraph (1) of this Article, Article 4 (3) of this Agreement, Article 5 of Annex A, Articles 1 and 5-6 of Annex B, and Article 6 of, and the Appendix to, Annex C, shall be provisionally applied after the date of signature of this Agreement, in accordance with their terms.

<u>Article 13</u>

(1)   One original copy of this Agreement shall be deposited by the High Representative with the Secretary-General of the United Nations, who shall act as Depositary.

(2)   The Depositary shall, upon entry into force of this Agreement, ensure its registration in accordance with Article 102 of the Charter of the United Nations.

Done at Vienna on 29 June 2001 in seven originals in the English language, one to be retained by each successor State, one by the Office of the High Representative, and one to be deposited with the Depositary.

For Bosnia and Herzegovina

For the Republic of Croatia

For the Republic of Macedonia

For the Republic of Slovenia

For the Federal Republic of Yugoslavia

Appendix to Agreement on Succession Issues

BIS Assets

1.       The five Delegations participating as equal successor States in the negotiations to resolve issues of succession arising upon the break-up of the SFRY have agreed (further to arrangements previously made on behalf of the National Banks of the successor States) that the former SFRY's assets (gold and other reserves, and shares) held at the Bank for International Settlements shall be divided between them in the following proportions:

| | |
|---|---|
| Bosnia and Herzegovina | 13.20% |
| Croatia | 28.49% |
| Macedonia | 5.40% |
| Slovenia | 16.39% |
| Federal Republic of Yugoslavia | 36.52% |

2.       The agreement of the five Delegations to the foregoing distribution is given on the basis of the understandings reached at the meetings held on 21-23 February and 9-10 April 2001 and is entirely without prejudice to what may be agreed as regards the distribution of any other assets.

Brussels, 10 April 2001

D.M.

**Annex A**


**Movable and Immovable property**


<u>Article 1</u>

(1)    In order to achieve an equitable solution, the movable and immovable State property of the federation constituted as the SFRY ("State property")shall pass to the successor States in accordance with the provisions of the following Articles of this Annex.

(2)    Other proprietary rights and interests of the SFRY are covered by Annex F to this Agreement.

(3) Private property and acquired rights of citizens and other legal persons of the SFRY are covered by Annex G to this Agreement.

<u>Article 2</u>

(1)    Immovable State property of the SFRY which was located within the territory of the SFRY shall pass to the successor State on whose territory that property is situated.

(2)    The successor States shall use their best endeavours to assist each other with the exercise of their diplomatic and consular activities by the provision of suitable properties in their respective territories.

## Article 3

(1)    Tangible movable State property of the SFRY which was located within the territory of the SFRY shall pass to the successor State on whose territory that property was situated on the date on which it proclaimed independence.

(2)    Paragraph (1) of this Article does not apply to tangible movable State property of great importance to the cultural heritage of one of the successor States and which originated from the territory of that State, such as: works of art; manuscripts, books and other objects of artistic, historical or archaeological interest to that State; and scientific collections and important collections of books or archives which shall pass to that State. Such property shall be identified by the successor State concerned as soon as possible, but not later than 2 years after the entry into force of this Agreement.

(3)    If SFRY State tangible movable property (other than military property) which has passed to one of the successor States in accordance with paragraph (1) of this Article, has been removed without authorisation, from its territory by another successor State, the latter state shall ensure its return as soon as possible or pay full compensation for such removal.

## Article 4

(1)    Notwithstanding paragraph (1) of Article 3 of this Annex, tangible movable State property of the SFRY which formed part of the military property of that State shall be the subject of special arrangements to be agreed among the successor States concerned.

(2)  In relation to tangible movable and immovable property of the former Yugoslav National Army used for civilian purposes the arrangements referred to in paragraph (1) of this Article will acknowledge the relevance of Articles 2 (1) and 3 (1) of this Annex.

## Article 5

(1)  A Joint Committee on Succession to Movable and Immovable Property shall be established by the successor States, which shall ensure the proper implementation of the provisions of this Annex applicable to tangible movable and immovable property (other than military property) and the resolution of any problems which might arise in the course of their application.

(2)  The Joint Committee shall commence its work within 3 months of the signature of this Agreement.

## Article 6

It shall be for the successor State on whose territory immovable and tangible movable property is situated to determine, for the purposes of this Annex, whether that property was State property of the SFRY in accordance with international law.

## Article 7

Where pursuant to this Annex property passes to one of the successor States, its title to and rights in respect of that property shall be treated as having arisen on the date on which it proclaimed independence, and any other successor State's title to and rights in respect of the property shall be treated as extinguished from that date.

## Article 8

(1)    Where tangible movable and immovable State property of the SFRY passes to a successor State in accordance with Articles 1 to 3 of this Annex, that property shall not be subject to valuation for the purposes of this Agreement, and no compensation shall be payable in respect of the passing of that property to the successor State in question.

(2)    However, should any successor State consider that the application of Articles 1 to 3 of this Annex result in a significantly unequal distribution of SFRY State property (other than military property) among the successor States, that State may raise the matter in the Joint Committee established pursuant to Article 5 of this Annex. The Joint Committee, acting unanimously, may take such action as it considers appropriate in the circumstances.

## Article 9

The provisions of this Annex are without prejudice to the provisions of Annexes B and D concerning diplomatic and consular properties, and archives.

**Annex B**

**Diplomatic and Consular Properties**

<u>Article 1</u>

(1)   As an interim and partial distribution of SFRY diplomatic and consular properties, the successor States have selected the following properties for allocation to each of them:

| | |
|---|---|
| Bosnia and Herzegovina | London (Embassy) |
| Croatia | Paris (Embassy) |
| Macedonia | Paris (Consulate General) |
| Slovenia | Washington (Embassy) |
| Federal Republic of Yugoslavia | Paris (Residence) |

(2)   Any action which may be necessary to enable each successor State to enter into possession of the property allocated to it shall be completed within six months of the date of signature of this Agreement.

<u>Article 2</u>

(1)   SFRY diplomatic and consular properties shall be distributed in kind (i.e. as properties) rather than by way of monetary payments.

(2) In that distribution, Bosnia and Herzegovina and Macedonia, are receiving a greater share than they would receive under the IMF key, or any other more favourable criterion for Bosnia and Herzegovina and Macedonia for the distribution of such properties.

## Article 3

Diplomatic and consular properties other than those acquired by States in accordance with Article 1 of this Annex shall be distributed in such a way that the total and final distribution in kind of diplomatic and consular properties (including those acquired in accordance with Article 1) reflects as closely as possible the following proportions by value for each State:

| | |
|---|---|
| Bosnia and Herzegovina | 15% |
| Croatia | 23.5% |
| Macedonia | 8% |
| Slovenia | 14% |
| Federal Republic of Yugoslavia | 39.5% |

## Article 4

(1) SFRY diplomatic and consular properties are set out in the list appended to this Annex. That list groups properties according to their geographical regions. Each successor State shall, within each geographical region, be entitled to its proportionate share as set out in Article 3.

(2) The distribution of properties shall be by agreement between the 5 States. To the extent that agreement on the distribution of properties cannot be reached, the

successor States shall adopt a procedure whereby any property selected by only one State will be acquired by that State, and where two or more States have selected the same property, those States will consult together as to which of them will acquire that property.

(3)    The basis for the proportionate distribution of properties is the valuation in the "Report dated 31 December 1992 on the valuation of the assets and liabilities of the former Socialist Federal Republic of Yugoslavia as at 31 December 1990."

(4)    Movable State property of the SFRY which forms part of the contents of diplomatic or consular properties shall pass to whichever successor State acquires the diplomatic or consular properties in question.

(5)    Movable State property of the SFRY which forms part of the contents of diplomatic and consular properties and which is of great importance to the cultural heritage of one of the successor States shall pass to that State.

## Article 5

The successor States shall establish a Joint Committee composed of an equal number of representatives from each State to ensure the effective implementation of Articles 3 and 4 of this Annex. The functions of the Joint Committee shall include:

(a)    verifying and as necessary amending the List referred to in Article 4(1);

(b)    assessing the legal status of each property, its physical condition, and any financial liabilities attaching to it; and

(c)    considering the valuation of property as the need arises.

## Article 6

The Joint Committee shall commence its work on a provisional basis within 3 months of the date of signature of this Agreement.

## Article 7

Whichever successor State is in a position to maintain and keep under repair any diplomatic or consular properties of the SFRY shall take the necessary steps to that end, bearing in mind in particular

(a)    the principle that it must at all times take the necessary measures to prevent loss or damage to or destruction of such properties, and

(b)    the requirement to pay compensation for any loss, damage or destruction resulting from failure to take such action.

| | | | | OECD | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| No | STATE | TYPE OF FACILITY | ADDRESS | Total area in sq.m. | Floor area in sq.m. | FACILITY VALUED AT | LAND VALUED AT | COMMENT | LEGAL STATUS |
| 1 | AUSTRALIA | Embassy | 11 Nuyts Street P.O. Box 3161 MANUKA, A.C.T. 2603 CANBERRA Australia | 1.205 | 545 | $1,6 | | 99 year lease from 14.09.1965 | Ownership |
| 2 | AUSTRALIA | Consulate General | CONSULATE GENERAL OF THE FR OF YUGOSLAVIA 12, Trelawney Street Woolahra N.S.W.201 SIDNEY Australia | 2.040 | 616 | $3,3 | | | Ownership |
| 3 | AUSTRALIA | Residence | 31 Fishburn Street Red Hill A.C.T. 2603 CANBERRA Australia | 1.416 | 516 | $1,3 | | 99 year lease from 14.09.1965 | Ownership |
| 4 | AUSTRALIA | Land | 31 Fishburn Street Red Hill A.C.T. 2603 CANBERRA Australia | 1.416 | | | $0,8 | 99 year lease from 14.09.1965 | Ownership |
| 5 | AUSTRIA | Embassy | BOTSCHAFT DER BR JUGOSLAWIEN Renveg 3 1030 WIEN III Osterrich | 500 | 1.300 | $ 2,7 | | | Ownership |
| 6 | AUSTRIA | Consulate General | Radetzkystrasse 26 9020 CELOVEC Osterrich | 1.088 | 744 | $ 0,8 | | Possessed by Slovenia | Ownership |
| 7 | AUSTRIA | Residence | Heuberggasse 10 1170 WIEN XVII Osterrich | 3.715 | 523 | $ 1,8 | | Possessed by Croatia | Ownership |
| 8 | BELGIQUE | Embassy | AMBASSADE DE LA RF DE YOUGOSLAVIE 11, Avenue Emile de Mot 1050 BRUXELLES Belgique | 678 | 1.560 | $ 3,5 | | | Ownership |

| OECD | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| No | STATE | TYPE OF FACILITY | ADDRESS | Total area in sq.m. | Floor area in sq.m. | FACILITY VALUED AT | LAND VALUED AT | COMMENT | LEGAL STATUS |
| 9 | CZECH Republic | Embassy | AMBASSADE DE LA RF DE YUGOSLAVIE Mostecka 15 11800 PRAGUE 1 | 1.038 | 2.722 | $ 2,6 | | | Ownership |
| 10 | DENMARK | Embassy | EMBASSY OF THE FR OF YUGOSLAVIA Svanevaeget 36 2100 COPENHAGEN Dannemark | 3.421 | 306 | $ 0,6 | | | Ownership |
| 11 | FINLAND | Embassy | EMBASSY OF THE FR OF YUGOSLAVIA Kulosaarentie 36 00570 HELSINKI 57 Finland | 1.200 | 540 | $ 1,3 | | | Ownership |
| 12 | FINLAND | Residence | Bomansonintie 13 00570 HELSINKI 57 Finland | 1.040 | 322 | $ 0,4 | | | Ownership |
| 13 | FRANCE | Embassy | AMBASSADE DE LA RF DE YUGOSLAVIE 54, Rue de la Faisanderie 75116 PARIS France | 260 | 1.658 | $ 14,1 | | | Ownership |
| 14 | FRANCE | Consulate | 5, Rue de la Faisanderie 75116 PARIS France | 384 | 809 | $ 6,5 | | | Ownership |
| 15 | FRANCE | Residence | 1, Boulevard Delessert 75116 PARIS France | 1.493 | 2.740 | $ 11,4 | | | Ownership |
| 16 | GREECE | Embassy/R residence and Consulate | AMBASSADE DE LA RF DE YOUGOSLAVIE 106 Vassilissis Sofias ATHENES Greece | 3.525 | 1.688 | $ 4,8 | | | Ownership |

| No | STATE | TYPE OF FACILITY | ADDRESS | Total area in sq.m. | Floor area in sq.m. | FACILITY VALUED AT | LAND VALUED AT | COMMENT | LEGAL STATUS |
|---|---|---|---|---|---|---|---|---|---|
| | | | **O E C D** | | | | | | |
| 17 | GREECE | Consulate General | CONSULAT GENERAL DE LA RF DE YUGOSLAVIE Komnino 4 THESALONIKI Greece | 273 | 400 | $ 0,9 | | Kingdom of Serbia | Ownership |
| 18 | ITALY | Embassy | AMBASCIATA DELLA RF DI JUGOSLAVIA Via dei Monti Parioli 20 00197 ROMA Italia | 2.817 | 2.035 | $ 6,9 | | | Ownership |
| 19 | ITALY | Consulate General | CONSOLATO DELLA RF DI JUGOSLAVIA Via Matilde Serao 1 20144 MILANO Italia | 1.661 | 1.000 | $ 4,7 | | | Ownership |
| 20 | ITALY | Residence | Via dei Monti Parioli 22-24 00197 ROMA Italia | 1.950 | 2.004 | $ 8,8 | | | Ownership |
| 21 | ITALY | Apartment | Via A.Ximenes 8 ROMA Italia | | 323 | $ 0,6 | | | Ownership |
| 22 | ITALY | Apartment | Via Archimeda 104 ROMA Italia | | 215 | $ 0,4 | | Possessed by Slovenia | Ownership |
| 23 | ITALY | Apartment | Viale Corsica 5 MILANO Italia | | 61 | $ 0,2 | | | Ownership |
| 24 | ITALY | Apartment | Via Cordaroli 7/I TRIESTE Italia | | 107 | $ 0,4 | | | Ownership |
| 25 | ITALY | Apartment | Viale D'Anunzio 27/I TRIESTE Italia | | 131 | $ 0,5 | | Possessed by Slovenia | Ownership |

| | | | | OECD | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| No | STATE | TYPE OF FACILITY | ADDRESS | Total area in sq.m. | Floor area in sq.m. | FACILITY VALUED AT | LAND VALUED AT | COMMENT | LEGAL STATUS |
| 26 | ITALY | Apartment | Via Bassegio 75/IV TRIESTE Italia | | 72 | $ 0,3 | | | Ownership |
| 27 | ITALY | Apartment | Via Bassegio 69/I TRIESTE Italia | | 49 | $ 0,2 | | | Ownership |
| 28 | ITALY | Apartment | Via Bassegio 69/II TRIESTE Italia | | 52 | $ 0,2 | | | Ownership |
| 29 | JAPAN | Embassy/Residence | EMBASSY OF THE FR OF YUGOSLAVIA 7-24, 4-chome, Kitashinagawa Shinagawa-ku TOKYO Japan | 938 | 1.726 | $ 16,0 | | | Ownership |
| 30 | KANADA (Canada) | Embassy | EMBASSY OF THE FR OF YUGOSLAVIA 17, Blackburn Avenue OTTAWA Ontario, KIN8A2 Canada | 1.071 | 965 | $ 2,5 | | | Ownership |
| 31 | KANADA (Canada) | Consulate General | CONSULATE GENERAL OF THE FR OF YUGOSLAVIA 377, Spadina Road TORONTO Ontario M5P 2V7 Canada | 1.091 | 556 | $ 1,3 | | | Ownership |
| 32 | KANADA (Canada) | Residence | 21, Blackburn Avenue OTTAWA Ontario, KIN8A2 Canada | 2.623 | 805 | $ 3,5 | | | Ownership |

| OECD | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| No | STATE | TYPE OF FACILITY | ADDRESS | Total area in sq.m. | Floor area in sq.m. | FACILITY VALUED AT | LAND VALUED AT | COMMENT | LEGAL STATUS |
| 33 | MADJARSKA (Hungary) | Embassy | AMBASSADE DE LA RF DE YOUGOSLAVIE Dozsa Gyorgy ut 92/b 1068 BUDAPEST VI Houngrie | 949 | 1.247 | $ 1,7 | | | Ownership |
| 34 | MADJARSKA (Hungary) | Residence | Borbolya utca 4 1023 BUDAPEST Houngrie | 1.066 | 484 | $ 0,6 | | | Ownership |
| 35 | MADJARSKA (Hungary) | House of Consul | Dozsa Gyorgy ut 92/a 1068 BUDAPEST VI Houngrie | 829 | 1.539 | $ 2,3 | | | Ownership |
| 36 | MEXICO | Embassy | EMBAJADA DE LA RF DE YUGOSLAVIA Av. Montanas Rocallosas No. 515 Apartado Postal 10-701 Lomas de Chapultepec 11000 MEXICO Mexico | 1.472 | 996 | $ 2,3 | | | Ownership |
| 37 | NETHERLANDS | Embassy | EMBASSY OF THE FR OF YUGOSLAVIA Groot Hertoginnelaan 30 2517 THE HAGUE Netherlands | 616 | 485 | $ 0,7 | | | Ownership |
| 38 | NEW ZEALAND | Embassy | 24, Hatton Street WELLINGTON-5 New Zeland | 1.962 | 281 | $ 0,5 | | Taken over by the Government of New Zealand since 1992 | Ownership |
| 39 | NEW ZEALAND | Residence | 33, Rama Crescen WELLINGTON New Zeland | 542 | 207 | $ 0,3 | | Taken over by the Government of New Zealand since 1992 | Ownership |

| | | | OECD | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| No | STATE | TYPE OF FACILITY | ADDRESS | Total area in sq.m. | Floor area in sq.m. | FACILITY VALUED AT | LAND VALUED AT | COMMENT | LEGAL STATUS |
| 40 | **NORWAY** | Embassy | EMBASSY OF THE FR OF YUGOSLAVIA Drammensveien 105 OSLO 2 N o r w e y | 984 | 732 | $ 1,7 | | | Ownership |
| 41 | **NORWAY** | Residence | Heyerdahls vei 9 OSLO N o r w e y | 3.082 | 380 | $ 1,4 | | | Ownership |
| 42 | **POLAND** | Embassy | AMBASSADE DE LA RF DE YOUGOSLAVIE Al. Ujazdowskie 23/25 VARSOVIE P o l o g n e | 3.251 | 1.799 | $ 2,1 | | 100 year lease from 1947 | Ownership |
| 43 | **POLAND** | Residence | Al. Ujazdowskie 23/25 VARSOVIE P o l o g n e | | 512 | $ 0,5 | | 100 year lease from 1947 | Ownership |
| 44 | **POLAND** | House | Alea Ru` 5 VARSOVIE P o l o g n e | 815 | 1.408 | $ 1,3 | | 80 year lease from 01.01. 1950 | Ownership |
| 45 | **PORTUGAL** | Embassy | EMBAIXADA DA RF DA IUGOSLAVIA Av. Das Descobertas 12 - Restelo 1400 LISBOA P o r t u g a l | 1.995 | 704 | $ 1,5 | | | Ownership |
| 46 | **PORTUGAL** | Residence | Rua Alcolena 11 Restelo 1400 LISBOA P o r t u g a l | 1.168 | 302 | $ 0,8 | | | Ownership |
| 47 | **S A D    (USA)** | Embassy | EMBASSY OF THE FR OF YUGOSLAVIA 2410 California Str. N.W. WASHINGTON D.C. 20008 U S A | 1.436 | 1.820 | $ 7,3 | | Reciprocity land | Ownership |

| | | | OECD | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| No | STATE | TYPE OF FACILITY | ADDRESS | Total area in sq.m. | Floor area in sq.m. | FACILITY VALUED AT | LAND VALUED AT | COMMENT | LEGAL STATUS |
| 48 | S A D (USA) | Permanent Mission UN | PERMANENT MISSION OF THE FR OF YUGOSLAVIA TO THE UNITED NATIONS 854, Fift Avenue NEW YORK N.Y. 10017 U S A | 339 | 1.679 | $ 11,8 | | | Ownership |
| 49 | S A D (USA) | Residence | 2221 R. Street, N.W. WASHINGTON D.C. U S A | 960 | 900 | $ 2,2 | | | Ownership |
| 50 | S A D (USA) | Residence | 730 Park Avenue NEW YORK N.Y. 10021 U S A | | 216 | $ 1,8 | | | Ownership |
| 51 | S A D (USA) | House | 1907 Quincy Street N.W. WASHINGTON D.C. U S A | 1.052 | 495 | $ 1,2 | | | Ownership |
| 52 | SPAIN | Embassy | EMBAJADA DE LA RF DE YUGOSLAVIA Calle de Velasqez 162 MADRID 28002 E s p a n a | 684 | 1.200 | $ 3,2 | | | Ownership |
| 53 | SPAIN | Residence | Ronda de Abubilla 34 Parq Conde de Orgaz MADRID 28043 E s p a n a | 1.480 | 413 | $1,0 | | | Ownership |
| 54 | SR NEMA^KA (Germany) | Embassy | BOTSCHAFT DER BR JUGOSLAWIEN Schlossallee 5 5300 BONN2 Bundesrepubik Deutschland | 3.079 | 2.392 | $ 5,4 | | | Ownership |
| 55 | SR NEMA^KA (Germany) | Consulate General | GENERALKONSULAT DER BR JUGOSLAWIEN Thueringer Strasse 3 6000 FRANKFURT AM MAIN Bundesrepublik Deutschland | 492 | 1.020 | $ 4,1 | | | Ownership |

| | | | OECD | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| No | STATE | TYPE OF FACILITY | ADDRESS | Total area in sq.m. | Floor area in sq.m. | FACILITY VALUED AT | LAND VALUED AT | COMMENT | LEGAL STATUS |
| 56 | SR NEMA^KA (Germany) | Military mission | BOTSCHAFT DER BR JUGOSLAWIEN BURO IN BERLIN Taubenstrasse 18 1 BERLIN 33 - GRUNEWALD | 6.474 | 1.500 | $ 4,5 | | | Ownership |
| 57 | SWEDEN | Embassy | EMBASSY OF THE FR OF YUGOSLAVIA Valhallavagen 70 11427 STOCHOLM Sweden | 424 | 815 | $ 5,3 | | | Ownership |
| 58 | SWEDEN | Residence | Tyrgaten 6 11427 STOCKHOLM Sweden | 315 | 981 | $ 4,8 | | | Ownership |
| 59 | SWITZERLAND | Embassy/Residence | AMBASSADE DE LA RF DE YOUGOSLAVIE Seminarstrasse 5 3006 BERN Suisse | 1.760 | 1.758 | $ 7,7 | | | Ownership |
| 60 | SWITZERLAND | Permanent Mission UN | MISSION PERMANENTE DE LA RF DE YOUGOSLAVIE AUPRES NATIONS UNIES 5, Chemin Thury GENEVE Suisse | 3.403 | 519 | $ 1,5 | | | Ownership |
| 61 | SWITZERLAND | Consulate General | Eidmattstrasse 33 8032 ZURICH Suisse | 195 | 435 | $ 1,5 | | | Ownership |
| 62 | TURKEY | Embassy | AMBASSADE DE LA RF DE YOUGOSLAVIE Paris Caddesi No. 47, Kavaklidere P.K. 28 - Kavaklidere ANKARA Turquie | 8.899 | 617 | $ 0,9 | | | Ownership |

| | | | | OECD | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| No | STATE | TYPE OF FACILITY | ADDRESS | Total area in sq.m. | Floor area in sq.m. | FACILITY VALUED AT | LAND VALUED AT | COMMENT | LEGAL STATUS |
| 63 | TURKEY | Residence | Ataturk Bulevard No. 132-134 ANKARA T u r q u i e | | 1.201 | $ 0,8 | | | Ownership |
| 64 | TURKEY | House | Paris Caddesi No. 47, Kavaklidere ANKARA T u r q u i e | | 240 | $ 0,2 | | | Ownership |
| 65 | TURKEY | Land | Istambul | 3.840 | | | $ 0,3 | Kingdom of Serbia | Ownership |
| 66 | VELIKA BRITANIJA (UK) | Embassy | EMBASSY OF THE FR OF YUGOSLAVIA 5-7 Lexham Gardens LONDON, W.8.5JU Great Britain | 463 | 1.308 | $ 10,9 | | | Ownership |
| 67 | VELIKA BRITANIJA (UK) | Residence | 25 Hyde Park Gate LONDON, S.W. 7.5DJ Great Britain | 365 | 490 | $ 2,0 | | | Ownership |
| | | | | | TOTAL: | $ 201, 00 | | | |

| REST OF EUROPE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| No | STATE | TYPE OF FACILITY | ADDRESS | Total area in sq.m. | Floor area in sq.m. | FACILITY VALUED AT | LAND VALUED AT | COMMENT | LEGAL STATUS |
| 68 | BULGARIA | Embassy | AMBASSADE DE LA RF YUGOSLAVIE Veliko Trnovo 3, Rue G. Geueorguiou-Dej SOFIA Bulgaria | 3.062 | 1.574 | $ 1,9 | | Kingdom of Serbia | Ownership |
| 69 | CYPRUS | Embassy/Residence | EMBASSY OF THE FR OF YUGOSLAVIA Vasilassias Olgas Street 2 P.O. Box 1968 NICOSIA Cyprus | 1.391 | 695 | $ 1,0 | | | Ownership |
| 70 | ROUMANIA | Embassy | AMBASSADE DE LA RF DE YOUGOSLAVIE Calea Dorobanilor Nr. 34 BUCAREST Roumanie | 1.671 | 722 | $ 1,2 | | Kingdom of Serbia | Ownership |
| 71 | SSSR (Russia) | Embassy | POSOLSTVO SR JUGOSLAVII Mosfiljmovskaja 46 MOSKVA Rossia | 14.746 | 5.484 | $ 15,4 | | Reciprocity land | Ownership |
| 72 | SSSR (Russia) | Residence | Mosfiljmovskaja 46 MOSKVA Rossia | | 591 | $ 1,2 | | Reciprocity land | Ownership |
| 73 | SSSR (Russia) | Garage | Mosfiljmovskaja 46 MOSKVA Rossia | | 874 | $ 0,2 | | Reciprocity land | Ownership |
| | | | | | TOTAL: | $ 20.9 | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | LATIN AMERICA AND CARRIBBEAN | | | | | | |
| No | STATE | TYPE OF FACILITY | ADDRESS | Total area in sq.m. | Floor area in sq.m. | FACILITY VALUED AT | LAND VALUED AT | COMMENT | LEGAL STATUS |
| 74 | ARGENTINA | Embassy | EMBAJADA DE LA RF DE YUGOSLAVIA Marcelo T. de Alvear 1705 1060 BUENOS AIRES Argentina | 238 | 818 | $ 1,7 | | | Ownership |
| 75 | BOLIVIA | Embassy/Residence | Calle Benito Joarez 315 Florida LA PAZ | 3.088 | 481 | $ 0,8 | | | Ownership |
| 76 | BRAZIL | Embassy | Avenida das Nacoes loe 15 Caixa Postal 1240 70000 BRASILIA D.F. Brazil | 25.000 | 2.070 | $ 4,0 | | | Ownership |
| 77 | BRAZIL | Residence | Avenida das Nacoes, lote 15 Caixa Postal 1240 70000 BRASILIA D.F. Brazil | | 1.646 | | | | Ownership |
| 78 | BRAZIL | Consulate General | Rua Alm. Pereira Guimaraes 258 01250 SAO PAULO Brazil | 605 | 521 | $ 0,6 | | | Ownership |
| 79 | BRAZIL | House | Avenida das Nacoes loe 15 Caixa Postal 1240 70000 BRASILIA D.F. Brazil | | 433 | $ 0,4 | | | Ownership |
| 80 | BRAZIL | Vila | Brasilia, Vila by the Lake | 776 | 319 | $ 0,4 | | | Ownership |
| 81 | CHILE | Consulate | EMBAJADA DE LA RF DE YUGOSLAVIA Calle Exequias Alliende 2370 Casilla Postale 1659 SANTIAGO DE CHILE Chile | 450 | 381 | $ 0,4 | | | Ownership |
| 82 | GUYANA | Embassy | 72, Brickdam P.O. Box 10408 GEORGETOWN | 521 | 480 | $ 0,5 | | | Ownership |

| No | STATE | TYPE OF FACILITY | ADDRESS | Total area in sq.m. | Floor area in sq.m. | FACILITY VALUED AT | LAND VALUED AT | COMMENT | LEGAL STATUS |
|----|-------|------------------|---------|---------------------|---------------------|--------------------|----------------|---------|--------------|
| | | | **LATIN AMERICA AND CARRIBBEAN** | | | | | | |
| 83 | PERU | Embassy | EMBAJADA DE LA RF DE YUGOSLAVIA Calle Carlos Porras Osores 360 San Isidor Casilla 18-0392 LIMA P e r u | 1.359 | 610 | $ 0,7 | | | Ownership |
| 84 | PERU | Residence | Calle a Cibeles 110 San Isidor LIMA P e r u | 1.052 | 901 | $ 0,5 | | | Ownership |
| 85 | URUGUAY | Embassy/Residence | Bulevard Espana 2697 MONTEVIDEO U r u g v a i | 920 | 528 | $ 0,6 | | | Ownership |
| 86 | VENEZUELA | Embassy | EMBAJADA DE LA RF DE YUGOSLAVIA Apartado 68011 Altamira Cuarta Avenida de Campo Alegre No. 13 Chacao CARACAS 1060 V e n e z u e l a | 2.210 | 600 | $ 0,8 | | | Ownership |
| | | | | | TOTAL: | $ 11,4 | | | |

| No | STATE | TYPE OF FACILITY | ADDRESS | Total area in sq.m. | Floor area in sq.m. | FACILITY VALUED AT | LAND VALUED AT | COMMENT | LEGAL STATUS |
|---|---|---|---|---|---|---|---|---|---|
| | | | ASIA | | | | | | |
| 87 | INDIA | Embassy | EMBASSY OF THE FR OF YUGOSLAVIA 3/50 G. Niti Marg, Chanakyapuri 110021 NEW DELHI India | 24.862 | 2.037 | $ 4,5 | | Land perpetual lease from 11.11. 1961 | Ownership |
| 88 | INDIA | Residence | 3/50 G. Chantipath, Chanakyapuri 110021 NEW DELHI India | | 1.358 | $ 1,4 | | Land perpetual lease from 11.11. 1961 | Ownership |
| 89 | INDIA | Servants quarters | 3/50 G. Niti Marg, Chanakyapuri 110021 NEW DELHI India | | 897 | $ 0,2 | | Land perpetual lease from 11.11. 1961 | Ownership |
| 90 | INDONESIA | Embassy | EMBASSY OF THE FR OF YUGOSLAVIA H.O.S. Cokroaminoto No. 109 JAKARTA PUSAT Indonesia | 563 | 833 | $ 0,5 | | | Ownership |
| 91 | KAMPUCHIA (Cambodia) | Residence | 129-131 Vithei Preah Bat Nordom PNOM PEN Kampuchia | 1.120 | 653 | $ 0,3 | | | Ownership |
| 92 | LEBANON | Land | Beiruth | 1.974 | | | $ 0,6 | | Ownership |
| 93 | PAKISTAN | Land | Islamabad | 16.452 | | | $ 1,6 | | Ownership |
| | | | | | TOTAL: | $ 9,1 | | | |

| NORTH AFRICA | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| No | STATE | TYPE OF FACILITY | ADDRESS | Total area in sq.m. | Floor area in sq.m. | FACILITY VALUED AT | LAND VALUED AT | COMMENT | LEGAL STATUS |
| 94 | ALGERIA | Embassy | AMBASSADE DE LA RF DE YUGOSLAVIE 7, Rue des Freres Benhafid - Hydra B.P. 632 ALGER Algerie | 641 | 540 | $ 0,6 | | | Ownership |
| 95 | EGYPT | Embassy Residence Consulate | EMBASSY OF THE FR OF YUGOSLAVIA 33, El Monsour Mohamed Street, Zamalek CAIRO Arap Republic of Egypt | 2.678 | $ 1,948 | $ 2,3 | | | Ownership |
| 96 | EGYPT | Garage | 33, El Monsour Mohamed Street, Zamalek CAIRO Arap Republic of Egypt | | 77 | $ 0,1 | | | Ownership |
| 97 | MOROCCO | Embassy/ Residence | 23, Avenue Ben I Znassen, Souissi B.P. 5014 RABAT Maroc | 1.758 | 592 | $ 0,8 | | | Ownership |
| 98 | TUNISIE | Embassy | AMBASSADE DE LA RF DE YUGOSLAVIE 4, Rue de Liberia TUNIS Tunisie | 378 | 373 | $ 0,4 | | | Ownership |
| 99 | TUNISIE | Residence | 23, Avenue de la Republique Carthage TUNIS Tunisie | 856 | 400 | $ 0,5 | | Not to be included in succession | Reciprocity |
| | | | | | TOTAL: | $ 4,7 | | | |

| AFRICA SOUTH OF SAHARA | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| No | STATE | TYPE OF FACILITY | ADDRESS | Total area in sq.m. | Floor area in sq.m. | FACILITY VALUED AT | LAND VALUED AT | COMMENT | LEGAL STATUS |
| 100 | C A R | Embassy | AMBASSADE DE LA RF DE YOUGOSLAVIE Avenue Leopold Sedar Senghor B.P. 1049 BANGUI | 2.009 | 432 | $ 0,6 | | | Ownership |
| 101 | C A R | Residence | Avenue Leopold Sedar Senghor B.P. 1049 BANGUI | | 360 | $ 0,3 | | | Ownership |
| 102 | ETIOPIJA | Embassy/Residence | EMBASSY OF THE FR OF YUGOSLAVIA P.O. Box 1341 ADIS ABEBA E t h i o p i a | 11.000 | 2.490 | $ 3,6 | | | Ownership |
| 103 | GUINEA | Residence | Domaine Public Martime a Camayenne CONAKRY II Republique de Guinee | 625 | 243 | $ 0,3 | | | Ownership |
| 104 | KENYA | Embassy | EMBASSY OF THE FR OF YUGOSLAVIA State House Avenue P.O. Box 30504 NAIROBI K e n i a | 8.784 | 698 | $ 1,6 | | Land-lease until 01.07.2064 | Ownership |
| 105 | KENYA | Residence | Lower Kabete Road NAIROBI K e n i a | 7.187 | 315 | $ 1,0 | | | Ownership |
| 106 | KONGO (Congo) | Embassy | AMBASSADE DE LA RF DE YOUGOSLAVIE Rue Lucien Fourneau P.O. Box 2062 BRAZZAVILLE | 1.535 | 337 | $ 0,5 | | | Ownership |
| 107 | KONGO (Congo) | Residence | Avenue General de Gaulle BRAZZAVILLE | 2.890 | 498 | $ 0,8 | | | Ownership |

| No | STATE | TYPE OF FACILITY | ADDRESS | Total area in sq.m. | Floor area in sq.m. | FACILITY VALUED AT | LAND VALUED AT | COMMENT | LEGAL STATUS |
|---|---|---|---|---|---|---|---|---|---|
| | | | **AFRICA SOUTH OF SAHARA** | | | | | | |
| 108 | KONGO (Congo) | Apartment | Sodafe Mfoa IV BRAZZAVILLE | | 107 | $ 0,1 | | | Ownership |
| 109 | MADAGASKAR | Residence | Route de Fort Ducheane TENANARIVA Madagascar | 4.223 | 322 | $ 0,7 | | | Ownership |
| 110 | MALI | Residence | Rue Braseire Quartier Fleuve BAMAKO Malie | 832 | 204 | $ 0,3 | | | Ownership |
| 111 | SUDAN | Embassy | 1 Street 31, 79-A P.O. Box 1180 KHARTOOM Sudan | 1.855 | 427 | $ 0, 6 | | | Ownership |
| 112 | SUDAN | Residence | Sagiat Hamad 35 Plot 12 KHARTOOM-North Sudan | 3.851 | 455 | $ 0,8 | | | Ownership |
| 113 | TANZANIA | Embassy | EMBASSY OF THE FR OF YUGOSLAVIA Plot No. 36, Upanga Road P.O. Box 2838 DAR ES SALAM Tanzania | 3.459 | 882 | $ 1,2 | | Land-lease until 06.09.2048 | Ownership |
| 114 | TANZANIA | Residence | 46, Ghuba Road DAR ES SALAM Tanzania | 5.090 | 378 | $ 0,5 | | | Ownership |
| 115 | UGANDA | Embassy | 11, George Street P.O. Box 4370 KAMPALA Uganda | 2.279 | 457 | $ 0,9 | | 99 year lease from 18.12. 1969 | Ownership |
| 116 | UGANDA | Land | Kolo Hill Drave | 2.780 | | | $ 0,3 | 99 year lease from 14.11.1969 | Ownership |

| | | | AFRICA SOUTH OF SAHARA | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| No | STATE | TYPE OF FACILITY | ADDRESS | Total area in sq.m. | Floor area in sq.m. | FACILITY VALUED AT | LAND VALUED AT | COMMENT | LEGAL STATUS |
| 117 | ZAIRE | Embassy/Residence | AMBASSADE DE LA RF YOUGOSLAVIE Q.U.E. l'etoile 112 B.P. 619 KINSHASA I Republique du Zaire | 503 | 681 | $ 0,7 | | | Ownership |
| 118 | ZAMBIA | Embassy | EMBASSY OF THE FR OF YUGOSLAVIA P.O. Box 31180 Diplomatic triangle, Plot no. 5216 LUSAKA Z a m b i a | 13.425 | 601 | $ 1,9 | | 100 year lease from 20.07.1971 | Ownership |
| 119 | ZAMBIA | Residence | Lukulu Road, Plot no 5216 LUSAKA Z a m b i a | 2.331 | 280 | $ 0,3 | | 99 year lease from 31. 12. 1964 | Ownership |
| 120 | ZAMBIA | House | 5018 Rhodes Park LUSAKA Z a m b i a | 2.498 | 117 | $ 04 | | 99 year lease from 30.08.1967 | Ownership |
| 121 | ZIMBABWE | Embassy | EMBASSY OF THE FR OF YUGOSLAVIA 1, Lanark Road, Belgravia P.O. Box 3420 HARARE Z i m b a b w e | 3.475 | 410 | $ 0,9 | | | Ownership |
| 122 | ZIMBABWE | Residence | 41, Argyle Drive, Highlands HARARE Z i m b a b w e | 6.265 | 230 | $ 0,9 | | | Ownership |
| 123 | ZIMBABWE | House | 1, Lanark Road, Belgravia HARARE Z i m b a b w e | | 100 | $ 0,1 | | | Ownership |
| | | | | | | TOTAL: | $ 19,3 | | |

**Annex C**

**Financial Assets and Liabilities**

Article 1

The SFRY's financial assets comprised all financial assets of the SFRY (such as cash, gold and other precious metals, deposit accounts, and securities), including in particular -

(a)     accounts and other financial assets in the name of the SFRY Federal Government Departments and Agencies;

(b)     accounts and other financial assets in the name of the National Bank of Yugoslavia;

(c)     foreign currency assets, including holdings of gold and other precious metals, of the SFRY or the National Bank of Yugoslavia;

(d)     sums due to the National Bank of Yugoslavia from banks in other countries resulting from uncompleted inter-bank clearing arrangements; such countries include, but are not limited to, those listed in Appendix 2 of this Annex.

(e)     financial quotas and drawing rights of the SFRY, the National Bank of Yugoslavia or other federal organs or institutions in international financial organisations, as well as financial assets held with such organisations.

(f) other assets of the SFRY, including amounts due to the National Bank of Yugoslavia or the SFRY from obligors other than those included in (a) – (e) above.

Article 2

(1)(a)    The SFRY's financial liabilities comprised (subject to paragraphs (2) and (3) of this Article) the debts of the SFRY, debts guaranteed by the SFRY and financial claims against the SFRY, and consisted principally of –

(i) the external debt of the SFRY to official creditors and the International Financial Institutions;

(ii) the external debt of the SFRY to commercial creditors;

(iii) sums payable by the National Bank of Yugoslavia to banks in other countries resulting from uncompleted inter-bank clearing arrangements. Such countries include, but are not limited to, those listed in Appendix 2 to this Annex;

(iv) external debt of the SFRY to creditors other than those listed in (i) – (iii), above.

(b)    External debt in (i) – (iv) above is described as allocated debt if the final beneficiary of the debt is located on the territory of a specific successor State or group of successor States. Allocated debt is not subject to succession and shall be accepted by the successor State on the territory of which the final beneficiary is located.

(c) Liabilities of the SFRY, National Bank of Yugoslavia or other federal institutions towards international financial organisations are included under the external debt of the SFRY.

(2) The financial liabilities to be taken into account pursuant to paragraph (1) of this Article do not include the financial liabilities of the SFRY under the Agreement concluded between the SFRY and Italy on 18 February 1983 on the Final Settlement of Reciprocal Obligations.

(3) Other financial liabilities include:

(a) guarantees by the SFRY or its National Bank of Yugoslavia of hard currency savings deposited in a commercial bank and any of its branches in any successor State before the date on which it proclaimed independence; and

(b) guarantees by the SFRY of savings deposited before certain dates with the Post Office Savings Bank at its branches in any of the Republics of the SFRY.

Article 3

(1) A major portion of the assets and liabilities of the SFRY have already in practice been distributed on the basis of agreements between the successor States or agreements between them individually and the institutions concerned, namely:

(a) the SFRY's share of the assets and liabilities of the International Monetary Fund;

(b) shares of the World Bank and its affiliated institutions held by the SFRY;

(c) liabilities of the SFRY to the World Bank;

(d) shares of the European Bank for Reconstruction and Development, the African Development Bank and the Inter-American Development Bank held by the SFRY;

(e) the SFRY's debts to the European Investment Bank;

(f) the gold and other reserves and shares of the Bank for International Settlements, Basle held by the SFRY;

(g) guarantees by the SFRY of savings deposited before certain dates with the Post Office Savings Bank and its branches;

(h) that part of the SFRY's external official debt to members of the so-called "Paris Club" which has been assumed by certain of the successor States in proportions fixed in agreements between each of them and "Paris Club" members;

(i) that part of the SFRY's external commercial debt to banks (the so-called "London Club") under the New Financial Agreement 1988 which has been assumed by certain of the successor States in proportions fixed in agreements between each of them and the "London Club" members.

(2)    In regard to sub-paragraph (h) and (i) of paragraph (1) above, four of the five successor States have concluded agreements with the "Paris Club" and "London Club" creditors. The remaining successor State, the Federal Republic of Yugoslavia, will assume responsibility for all of its allocated debt to "Paris Club" and "London Club" creditors and its share of the unallocated debt to such creditors. This is expected to resolve the remaining "Paris

Club" and "London Club" claims against the SFRY. It is impossible to predict the outcome of this resolution at the present time, but the resolution of "Paris Club" and "London Club" claims by the FRY will, as between the successor States, conclude the resolution of their obligations to the "Paris Club" and the "London Club". The successor States shall terminate any existing legal proceedings or financial claims against each other in relation to "Paris Club" and "London Club" obligations upon the signature of this Agreement, and shall not institute any other such legal proceedings or financial claims in the future, whatever the outcome of the resolution by the FRY of "Paris Club" and "London Club" claims.

(3)      The distributions referred to in paragraph (1) of this Article are final and shall not be reopened by any of the successor States in the context of succession issues.

Article 4

Distributions of assets on a net basis include:

(a) the SFRY's ownership of a 27% share of the capital of the Yugoslav Bank for International Economic Co-operation, as it existed prior to its conversion to a commercial bank, which shall be distributed among the States according to the proportions agreed to in Article 5(2); and

(b) the net amount due to the National Bank of Yugoslavia from banks in other countries resulting from uncompleted inter-bank clearing arrangements, which shall be tabulated and distributed according to the proportions agreed to in Article 5(2). Such countries include, but are not limited to, those listed in Appendix 2 to this Annex.

Article 5

(1)      Foreign financial assets (such as cash, gold and other precious metals, deposit accounts and securities), whether held by the SFRY or the National Bank of Yugoslavia directly or with foreign banks, Yugoslav joint venture banks and agencies of Yugoslav banks abroad include the following:

> (i)   monetary gold (271,642.769 oz.) valued on 31 March 2001 at $70.18 million;
>
> (ii)  foreign exchange accounts held at foreign commercial banks and valued on 31 March 2001 at $307.61 million;
>
> (iii) foreign exchange accounts held at SFRY joint venture banks abroad and valued on 31 March 2001 at $ 645.55 million; and
>
> (iv)  gold (1209.78 oz.) formerly held by the France-UK-USA Gold Commission, valued on 22 May 2001 at $343.76 thousand.

(2)   The available foreign financial assets identified in paragraph (1) of this Article shall be distributed according to the following proportions, which shall be applied to items (i), (ii), (iii) and (iv) separately:

| | |
|---|---|
| Bosnia and Herzegovina | 15.50% |
| Croatia | 23.00% |
| Macedonia | 7.50% |
| Slovenia | 16.00% |
| Federal Republic of Yugoslavia | 38.00% |

(3)      If currently unknown foreign financial assets are found to exist within five years, they shall be distributed as soon as possible on the proportionate basis set out in paragraph (2) of this Article, and using the mechanism described in Article 6.

Article 6

Each successor State shall appoint a representative of the Central Bank or an other authorised representative to form a Committee, which shall meet within 30 days of the signature of this Agreement to arrange the modalities for the initial distributions identified in Article 5 of this Annex. Their objective will be to effect any distributions of assets as quickly as possible. In addition they will arrange jointly to verify, settle and effect distributions under Article 4 of this Annex. They will also make arrangements to distribute to the extent possible assets under Article 1(f) and liabilities under Article 2(1)(a)(iv) of this Annex according to the proportions agreed to in Article 5(2). The Committee will also prepare a definitive list of all SFRY external debt.

Article 7

Guarantees by the SFRY or its NBY of hard currency savings deposited in a commercial bank and any of its branches in any successor State before the date on which it proclaimed its independence shall be negotiated without delay taking into account in particular the necessity of protecting the hard currency savings of individuals. This negotiation shall take place under the auspices of The Bank for International Settlements.

Article 8

(1)    The return to successor States of their contributions to the Federal Fund for development of the less developed Republics and Kosovo, the payment of outstanding contributions due by successor States to the Fund, and the repayment of credits given to those States by the Fund, are cancelled.

(2)    The financial liabilities of the SFRY under the Agreement concluded between the SFRY and Italy on February 18, 1983 on the Final Settlement of Reciprocal Obligations shall be distributed to the successor States that are beneficiaries of this Agreement. Pursuant to the Agreement with Italy, concluded in 1955 between SFRY and the Republic of Italy, about local commerce between areas Gorizia-Udine and Sezana-Nova Gorica-Tolmin (Gorica Agreement) as well as between SFRY and the Republic of Italy for the border areas of Trieste on one side and Buje, Koper, Sezana on the other side (Trieste Agreement), together with the related payment arrangements, are excluded from the provisions of this paragraph. The issues related to the Trieste Agreement will be dealt with by Croatia and Slovenia. The issues related to the Gorica Agreement will be dealt with by the Republic of Slovenia only.

Article 9

In connection with the distributions agreed in the preceding Articles of this Annex the successor States have concluded the Disclosure Authorisation appended to this Annex, and shall to the extent that they have not already done so:

(a)    allow free access to and provide copies of such records and data requested by any successor State as are in its possession and relate to the SFRY's financial assets and liabilities. Accounts of the National Bank of Yugoslavia opened after the date on which UN sanctions were first imposed are not subject to this disclosure requirement.

(b)    exchange information on those accounts and financial assets held by banks in third States and belonging to connected persons (as defined by the authorities which in those States regulate the banking business).

Article 10

Each successor State has introduced a new currency and established its monetary independence. As such, no successor State shall pursue financial claims or legal proceedings against any other successor State related to the introduction of its new currency or the establishment of its monetary independence.

Appendix 1 to Annex C

Disclosure Authorisation

to Central Banks and/or responsible ministries regarding data on financial and other assets of the SFRY held by third country central banks and/or other financial institutions

The five Delegations participating in the discussions and negotiations to resolve issues of succession arising upon the break-up of the SFRY, and working toward the prompt distribution of the assets of the SFRY among the successor States within the framework of the agreement concluded between them in Vienna on May 25, 2001, have agreed that data on bank deposits, holdings of securities, or other types of financial assets of the National Bank of Yugoslavia (NBY), as well as other assets of the SFRY referred to in UN Security Council Resolution No. 1022 (collectively, the Frozen Accounts), held by foreign banks, foreign financial institutions or other foreign entities as they stood on 31 May 2001 should be made available to each of the successor States. To that end they hereby authorize Central Banks, responsible Ministries and/or other financial institutions to provide financial data in regard to Frozen Accounts to the Central Bank and Ministry of Finance of each successor State upon receipt of a request for such data made by the Central Bank of any successor State. Such data may include, but is not limited to, details regarding the composition and value of Frozen Deposit accounts in banks, financial institutions, and other entities on their territory or subject to their regulation, control, or administration.

In addition to supplying information for 31 May 2001, banks are requested to comply with subsequent requests for information on SFRY Frozen Accounts from any of the undersigned successor States.

If necessary to secure release of financial data in regard to Frozen Accounts, the National Bank of Yugoslavia (NBY) shall issue the authorizations necessary to permit disclosure of this information to the Central Banks and Ministries of Finance of the successor States. If required, such authorization shall include the name and address of the foreign bank, the account number, and any other information needed to identify the account.

No legal proceedings will be commenced by any successor State on the basis of financial data disclosed as a result of the foregoing arrangements.

This authorization takes effect on today's date, and is witnessed by the Special Negotiator for Succession Issues of the SFRY in the Office of the High Representative, Sir Arthur Watts.

Signed by the Heads of the Delegations:

Bosnia and Herzegovina
Prof. Dr. Milos Trifkovic

Republic of Croatia
Dr. Bozo Marendic

Republic of Macedonia
Mr. Nikola Todorcevski

Republic of Slovenia
Dr. Miran Mejak

Federal Republic of Yugoslavia
Prof. Dr. Dobrosav Mitrovic

Witnessed by:


Special Negotiator for Succession Issues

Sir Arthur Watts


Vienna, 25 May 2001

Appendix 2 to Annex C

| Country | Currency |
|---|---|
| Albania | XAL |
| Cambodia | XKH |
| Mongolia | KMN |
| Egypt | XEG |
| Guinea | XGN |
| CSSR | XCS |
| GDR | XDD |
| USSR<br>USSR – Credit 555 mil. | XSU |
| Brazil | XBR |
| Algeria | XDZ |
| USSR – clearing ruble | XEE |
| India | XIN |
| Bulgaria | LEV |
| Ghana | USD |
| Mexico | USD |

**Annex D**

**Archives**

<u>Article 1</u>

(a)  For  the  purposes  of  this  Annex,  "SFRY  State archives"  means  all  documents,  of  whatever  date  or  kind  and wherever  located,  which  were  produced  or  received  by  the SFRY  (or  by  any  previous  constitutional  structure  of  the Yugoslav  State  since  1  December  1918)  in  the  exercise  of its  functions  and  which,  on  30  June  1991,  belonged  to  the SFRY  in  accordance  with  its  internal  law  and  were,  pursuant to  the  federal  law  on  the  regulation  of  federal  archives, preserved  by  it  directly  or  under  its  control  as  archives for  whatever  purpose.

(b)  For  the  purposes  of  this  Annex,  "Republic  or other  archives"  refers  to  the  archives  of  any  of  the  States in  their  former  capacities  as  constituent  Republics  of  the SFRY,  or  of  their  territorial  or  administrative  units,  and means  all  documents,  of  whatever  date  or  kind  and  wherever located,  which  were  produced  or  received  by  any  of  those Republics  or  territorial  or  administrative  units  in  the exercise  of  their  functions  and  which,  on  30  June  1991, belonged  to  them  in  accordance  with  the  applicable  law  and were,  pursuant  to  the  law  on  the  regulation  of  archives  of each  of  the  Republics,  preserved  by  them  directly  or  under their  control  as  archives  for  whatever  purpose.

(c)  "Documents"  in  the  preceding  sub-paragraphs includes  film,  audio  and  video  tapes  and  other  recordings,

as well as any form of computerised records, and includes documents which constitute cultural property.

## Article 2

If Republic or other archives were displaced from the Republic to which they belonged, or if SFRY State archives were displaced from their proper location, they shall, subject to the provisions of this Annex and in accordance with international principles of provenance, be restored respectively to the Republic to which they belonged or their proper location as soon as possible by the State which currently has control of them.

## Article 3

The part of the SFRY State archives (administrative, current and archival records) necessary for the normal administration of the territory of one or more of the States shall, in accordance with the principle of functional pertinence, pass to those States, irrespective of where those archives are actually located.

## Article 4

(a) The part of the SFRY State archives which constitutes a group which

(i) relates directly to the territory of one or more of the States, or

(ii) was produced or received in the territory of one or more of the States, or

(iii) consists of treaties of which the SFRY was the depository and which relates only to matters concerning the territory of, or to institutions having their headquarters in the territory of, one or more of the States,

shall pass to those states, irrespective of where those archives are actually located.

(b) Pending the apportionment of SFRY State archives under this Article,

(i)     the original of the Treaty on Water Economy Problems between the SFRY and Greece signed in 1959 (Official Gazette of the SFRY No. 20 of 4 June 1960) and of the Treaty on the Preservation and Renewal of Frontier Signs on the Yugoslav-Greece Frontier for the Protection, Prevention and the Solution on Frontier Incidents (Official Gazette of the SFRY No. 20 of 26 February 1959) shall be transferred forthwith to the Republic of Macedonia.

(ii)    the original text or certified copies of the Treaty of Osimo and the Osimo Agreement of 1975, and any related agreements, archives and travaux préparatoires concerning their negotiation and implementation, shall be made available forthwith to Croatia and Slovenia in order to enable them, in full possession of the relevant material, to negotiate with Italy over the consequences of those treaties for their respective States.

Article 5

If pursuant to Articles 3 or 4 archives are to pass to more than one State, those States shall agree which of them will receive the original and enable the others to make copies.

Article 6

(a)  In relation to SFRY State archives other than those referred to in Articles 3 and 4, the States shall, by agreement to be reached within 6 months of the entry into force of this Agreement, determine their equitable distribution among themselves or their retention as common heritage of the States which shall have free and unhindered access to them. If no such agreement is reached, the archives shall become common heritage. In either event, each State may make copies of the archives in question on an equitable cost-sharing basis.

(b) The agreement referred to in paragraph (a) shall take account of all relevant circumstances which include the observance as far as possible of the principle of respect for the integrity of groups of SFRY State archives so as to facilitate full access to and research in those groups of archives. Respect for the integrity of groups of archives is without prejudice to the question where any particular group of archives should be preserved. The Ministries or Departments responsible for archives in each of the States shall within 24 months of the date on which this Agreement enters into force identify, and circulate to each other, lists of groups of archives to which this principle should apply, and shall thereafter seek to agree on a single such list within a further period of 3 months.

They shall also identify, and circulate to each other, within 24 months of the date on which this Agreement enters into force, lists of archives to which Articles 3 and 4 apply.

Article 7

Pending implementation of this Agreement there shall be immediate free and unhindered access by representatives of the interested States to SFRY State archives dated on or before 30 June 1991. This access also applies to Republic and other archives (other than current archives) now held in the States concerned.

Article 8

Republic or other archives are the property of the corresponding State and are not subject to the provisions of this Annex, other than Articles 1, 2 and 7.

Article 9

Private archives are not subject to the other provisions of this Article. Those which were taken from their owners after 1 December 1918 shall be returned to where they had been produced or to their owners, according to international principles of provenance, without any compensation or other conditions.

Article 10

Where SFRY bilateral treaties concerning the restitution of archives were in force on 30 June 1991 and those treaties

have not yet been fully performed, the States with an interest in those archives are ready to assume the rights and obligations formerly held by the SFRY in relation to the performance of those treaties.

Article 11

(a) The current possessor of the original of any archive which is to be transferred pursuant to this Annex may make copies thereof.

(b) The cost of making copies pursuant to Articles 5 and 11(a) above shall be subject to further agreement between the States concerned.

(c) The cost of transporting archives which pass pursuant to this Annex shall be borne by the recipient.

(d) The current possessor of archives which are to be transported or which may be copied pursuant to this Annex shall assist in reducing the related costs as far as possible.

(e) Any State making archives available for copying shall provide the best available document to copy and provide free and equal access to all States making copies.

(f) The State in possession of original documents forming part of the SFRY State Archives shall provide access to them for purposes of obtaining a certified copy for use as evidence upon the request of the interested user, should the copy available in another State not be usable for his legitimate needs.

Article 12

Within 3 months of the date on which this Agreement enters
into force, representatives of the Ministries or
Departments responsible for archives in each of the States
shall meet together to give effect to this Annex, and to
take such immediate action as may be possible. Arrangements
for that meeting, and for the initial general supervision
of the implementation of this Annex, shall be made by the
Standing Joint Committee established under Article 4 of
this Agreement.

**Annex E**

**Pensions**

<u>Article 1</u>

Each State shall assume responsibility for and regularly pay legally grounded pensions funded by that State in its former capacity as a constituent Republic of the SFRY, irrespective of the nationality, citizenship, residence or domicile of the beneficiary.

<u>Article 2</u>

Each State shall assume responsibility for and regularly pay pensions which are due to its citizens who were civil or military servants of the SFRY irrespective of where they are resident or domiciled, if those pensions were funded from the federal budget or other federal resources of the SFRY; provided that in the case of a person who is a citizen of more than one State –

(i) if that person is domiciled in one of those States, payment of the pension shall be made by that State, and

(ii) if that person is not domiciled in any State of which such person is a citizen, payment of the pension shall be made by the State in the territory of which that person was resident on 1 June 1991.

Article 3

The States shall, if necessary, conclude bilateral arrangements for ensuring the payment of pensions pursuant to Articles 1 and 2 above to persons located in a State other than that which is paying the pensions of those persons, for transferring the necessary funds to ensure payment of those pensions, and for the payment of pensions proportionally to the payment of contributions. Where appropriate, the conclusion of such definitive bilateral arrangements may be preceded by the conclusion of interim arrangements for ensuring the payment of pensions pursuant to Article 2. Any bilateral agreements concluded between any two of the States shall prevail over the provisions of this Annex and shall resolve the issue of mutual claims between the pension funds of the States relating to payments of pensions made before such agreements entered into force.

**Annex F**

**Other rights, interests and liabilities**

Article 1

All rights and interests which belonged to the SFRY and which are not otherwise covered by this Agreement (including, but not limited to, patents, trade marks, copyrights, royalties, and claims of and debts due to the SFRY) shall be shared among the successor States, taking into account the proportion for division of SFRY financial assets in Annex C of this Agreement. The division of such rights and interests shall proceed under the direction of the Standing Joint Committee established under Article 4 of this Agreement.

Article 2

All claims against the SFRY which are not otherwise covered by this Agreement shall be considered by the Standing Joint Committee established under Article 4 of this Agreement. The successor States shall inform one another of all such claims against the SFRY.

## Annex G

### Private Property and Acquired Rights

## Article 1

Private property and acquired rights of citizens and other legal persons of the SFRY shall be protected by successor States in accordance with the provisions of this Annex.

## Article 2

(1)(a)  The rights to movable and immovable property located in a successor State and to which citizens or other legal persons of the SFRY were entitled on 31 December 1990 shall be recognised, and protected and restored by that State in accordance with established standards and norms of international law and irrespective of the nationality, citizenship, residence or domicile of those persons. This shall include persons who, after 31 December 1990, acquired the citizenship of or established domicile or residence in a State other than a successor State. Persons unable to realize such rights shall be entitled to compensation in accordance with civil and international legal norms.

(b)  Any purported transfer of rights to movable or immovable property made after 31 December 1990 and concluded under duress or contrary to sub-paragraph (a) of this Article shall be null and void.

(2)    All contracts concluded by citizens or other legal persons of the SFRY as of 31 December 1990, including those concluded by public enterprises, shall be respected on a non-discriminatory basis. The successor States shall provide for the carrying out of obligations under such contracts, where the performance of such contracts was prevented by the break-up of the SFRY.

## Article 3

The successor States shall respect and protect rights of all natural and juridical persons of the SFRY to intellectual property, including patents, trade marks, copyrights, and other allied rights (e.g., royalties) and shall comply with international conventions in that regard.

## Article 4

The successor States shall take such action as may be required by general principles of law and otherwise appropriate to ensure the effective application of the principles set out in this Annex, such as concluding bilateral agreements and notifying their courts and other competent authorities.

## Article 5

Nothing in the foregoing provisions of this Annex shall derogate from the provisions of bilateral

agreements concluded on the same matter between successor States which, in particular areas, may be conclusive as between those States.

## Article 6

Domestic legislation of each successor State concerning dwelling rights ("stanarsko pravo/ stanovanjska pravica/ станарско право") shall be applied equally to persons who were citizens of the SFRY and who had such rights, without discrimination on any ground such as sex, race, colour, language, religion, political or other opinion, national or social origin, association with a national minority, property, birth or other status.

## Article 7

All natural and legal persons from each successor State shall, on the basis of reciprocity, have the same right of access to the courts, administrative tribunals and agencies, of that State and of the other successor States for the purpose of realising the protection of their rights.

## Article 8

The foregoing provisions of this Annex are without prejudice to any guarantees of non-discrimination related to private property and acquired rights that exist in the domestic legislation of the successor States.

| **CERTIFICATION** | **CERTIFICAT** |
|---|---|
| I hereby certify that the attached document is a true copy of the Agreement on Succession Issues, adopted in Vienna on 29 June 2001, the original of which is deposited with the Secretary-General of the United Nations. | Je certifie que le document ci-joint est une copie conforme de l'Accord sur les questions de succession, adopté à Vienne le 29 juin 2001, dont l'original est déposé auprès du Secrétaire général de l'Organisation des Nations Unies. |
| Legal Officer in charge of the Treaty Section, Office of Legal Affairs | Juriste chargée de la Section des traités, Bureau des affaires juridiques |

Arancha Hinojal Oyarbide

| United Nations | Organisation des Nations Unies |
|---|---|
| New York, January 2019 | New York, janvier 2019 |

*ExH. B*

RECEIVED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

NOV 08 2019

DAVID H. YAMASAKI, Clerk of the Court

BY_____DEPUTY

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

DEC 02 2019

DAVID H. YAMASAKI, Clerk of the Court

BY_____DEPUTY

Daniel Cavic
1122 Buckingham Drive, Apt. C
Costa Mesa, CA 92626
(714) 931-7717

Plaintiff in Pro Per

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE – CENTRAL JUSTICE CENTER

DANIEL CAVIC, an individual; dba D.C. PRECISION COMPANY

Plaintiff,

vs.

YUGOBANKA A.D. BEOGRAD, a Beograd and New York Agency

Defendants.

Case No: 30-2019-01055993-CL-UD-CJC

[PROPOSED] JUDGMENT

Plaintiff Daniel Cavic, an individual dba D.C. Precision Company (hereinafter "Plaintiff") is entitled to a default judgment against Defendants Yugobanka A.D. Beograd, a Beograd Agency, and Yugobanka A.D. Beograd, a New York Agency (hereinafter "Defendants"). This is due to Defendants' failure to file a response in this lawsuit. Plaintiff filed a suit against Defendants on March 12, 2019. To date, Defendants have not filed any kind of response. An entry of default was entered against Defendants on August 22, 2019.

Plaintiff is entitled to damages in the amount of $738,722.23. This is the sum total of original damages in the amount of $31,273.00, prejudgment interest at the annual rate of

10% compound interest in the amount of $450,667.23, attorney fees in the amount of $5,000.00, costs in the amount of $1,782.00, and punitive damages in the amount of $250,000.00. Attached to this judgment is the "Declaration of Interest Calculation" which provides a detailed, definitive breakdown and justification for these amounts. This Declaration starts with the original deposit amount of $31,273 given in 1991. Then it gives a yearly calculation of 10% compound interest on that amount up to the expected date of the signing of the judgment, which is November 15, 2019. It also reflects a credit of $7,113.00, which was given to Plaintiff in 2017. This amount was deducted from the total amount owed which left the current balance due of $402,875.85 for the year 2017. Then the 10% compound interest calculations continue to reflect the total amount owed up to the expected date of the signing of the judgment, which is November 15, 2019. This "Declaration of Interest Calculation" is provided in addition to the "Declaration of Daniel Cavic in Support of Application for Default Judgment Pursuant to CCP §585(d)" which is required for the submission of a default judgment application. These declarations clearly and thoroughly support Plaintiff's entitlement to the damages amount he is claiming in his judgment package.

IT IS HEREBY ORDERED:

Judgment is entered in favor of the Plaintiff against the Defendants in this case; Defendants Yugobanka A.D. Beograd, a Beograd Agency, and Yugobanka A.D. Beograd, a New York Agency is ordered to pay Plaintiff Daniel Cavic, an Individual dba D.C. Precision Company $738,722.23 in damages. Note, daily interest $202.39 after 11-15-2019, or after date of Judgment.

DATED:    DEC 0 2 2019

_____

NATHAN SCOTT

Honorable Judge of the Superior Court of California

Certified true copy (XXIX-1)
Copie certifiée conforme (XXIX-1)
January 2019/january 2019

## DECLARATION OF INTEREST CALCULATION

This Amended Declaration is to clarify Compounded interest, 10% per year, starting on Jan. 1, 1991, till October 31. 2019. ( Less $7,113 received in 2017) Original deposit amount is $31,273, from year 1991.

1. $31,273.00 +10% compounded interest =$34,400.30,  year1991
2. $37,840.33, year 1992, Dec. 31.
3. $41,624.36, year 1993
4. $45,786.80, year 1994
5. $50,365.48, year 1995
6. $55,402.03, year 1996
7. $60,942.23, year 1997
8. $67,036.45, year 1998
9. $73,740.10, year 1999
10. $81,114.11, year 2000
11. $89,225.52, year 2001
12. $98,148.07, year 2002
13. $107,962.88, year 2003
14. $118,759.16, year 2004
15. $130,635.08, year 2005
16. $143,688.59, year 2006
17. $158,068.45, year 2007
18. $173,875.29, year 2008
19. $191,262.82, year 2009
20. $210,389.11, year 2010
21. $231,428.02, year 2011
22. $254,570.82, year 2012
23. $280,027.90, year 2013
24. $308,030.69, year 2014
25. $338,833.76, year 2015
26. $372,717.13, year 2016
27. $409,988.85, year 2017, less credit received $7,113.00 as principal reduction, = $402,875.85
28. $443,163.43, year 2018
29. $481,840.23, year 2019, up to November 15, 2019 ( expected date of judgment)
   Note, this is a total amount of Interest , including original deposit of $31,273.00. Total compounded interest only is $450,667.23, up to November 15, 2019.
   Daniel Cavic                                              November 7.2019.

# State of California
## Secretary of State

This Certificate is not valid for use anywhere within the United States of America, its territories or possessions.

## APOSTILLE
(Convention de La Haye du 5 octobre 1961)

| Country:<br>Pays / País: | United States of America | | |
|---|---|---|---|
| **This public document**<br>Le présent acte public / El presente documento público | | | |
| has been signed by<br>a été signé par<br>ha sido firmado por | Patty Conde | | |
| acting in the capacity of<br>agissant en qualité de<br>quien actúa en calidad de | Deputy | | |
| bears the seal / stamp of<br>est revêtu du sceau / timbre de<br>y está revestido del sello / timbre de | County of Orange, State of California | | |
| **Certified**<br>Attesté / Certificado | | | |
| at<br>à / en | Los Angeles, California | 6.the<br>le / el día | 19th day of February 2020 |
| by<br>par / por | Secretary of State, State of California | | |
| N°<br>sous n°<br>bajo el número | 15735 | | |
| Seal / stamp:<br>Sceau / timbre:<br>Sello / timbre: | | 10. Signature:<br>Signature:<br>Firma: | |

Apostille only certifies the authenticity of the signature and the capacity of the person who has signed the public document, and, where appropriate, the identity of the seal or stamp which the public document bears.
Apostille does not certify the content of the document for which it was issued.
Verify the issuance of this Apostille: see: apostille-search.sos.ca.gov/.
certificate does not constitute an Apostille under the Hague Convention of 5 October 1961, when it is presented in a country which is not a party to the Convention. In such cases, the certificate should be presented to the consular section of the mission representing that country.

Apostille atteste uniquement la véracité de la signature, la qualité en laquelle le signataire de l'acte a agi et, le cas échéant, l'identité du sceau ou timbre dont l'acte public est revêtu.
L'apostille ne certifie pas le contenu de l'acte pour lequel elle a été émise.
L'apostille peut être vérifiée à l'adresse suivante: apostille-search.sos.ca.gov/.
certificat ne constitue pas une Apostille en vertu de la Convention de La Haye du 5 Octobre 1961, lorsque présenté dans un pays qui n'est pas partie à cette Convention. Dans ce cas, le certificat doit être présenté à la section consulaire de la mission qui représente ce pays.

Apostille certifica únicamente la autenticidad de la firma, la calidad en que el signatario del documento haya actuado y, en su caso, la identidad del sello o del que el documento público esté revestido.
Apostilla no certifica el contenido del documento para el cual se expidió.
Apostilla se puede verificar en la dirección siguiente: apostille-search.sos.ca.gov/.
certificado no constituye una Apostilla en virtud del Convenio de La Haya de 5 de octubre de 1961 cuando se presenta en un país que no es parte del convenio. En estos casos, el certificado debe ser presentado a la sección consular de la misión que representa a ese país.

late Form NP-40 LA (rev. 09/2019)



*EXH. C*

**SUPREME COURT OF THE STATE OF**
**NEW YORK COUNTY OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                 :

In the Matter of the Liquidation of
JUGOBANKA, A.D., BEOGRAD NEW       :   Index No. 400649/12
YORK AGENCY, a New York-licensed
foreign banking agency.                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## AMENDED LIST OF ACCEPTED AND REJECTED CLAIMS

On July 30, 2012, pursuant to Section 624(4) of the New York Banking Law, the

Superintendent of Financial Services of the State of New York (the "Superintendent") filed in the

above-captioned matter a list of all duly filed claims and accounts payable that the

Superintendent has accepted or rejected. Please be advised that this list is hereby amended to

include the Superintendent's determinations of claim numbers 089, 090, 091, 092, and 093 that

were omitted from the original list of claims filed on March 22, 2012, and added thereto on

July 26, 2012.

Dated: New York, New York
        October 22, 2012

                                        William J. Snipes
                                        SULLIVAN & CROMWELL LLP
                                        125 Broad Street
                                        New York, New York 10004-2498
                                        (212) 558-4000

                                        *Counsel for the Superintendent of Financial*
                                        *Services of the State of New York*

NEW YORK
COUNTY CLERK'S OFFICE

OCT

NOT COMPARED
WITH COPY FILE

NEW YORK
COUNTY CLERK'S OFFICE

OCT 22 2012

NOT COMPARED
WITH COPY FILE

# List of Accepted and Rejected Claims Against Jugobanka New York Agency[1]

| Claim Number | Claimant Name | Nature of Claim | Claimed Amount | Determination | Principal Amount Accepted[2] |
|---|---|---|---|---|---|
| 001 | D.C. Precision Co. | Account Balance | $31,273.00 | Accepted | $31,273.00 |
| 002 | Savo Dojcinovic | Account Balance | $59,378.98 | Rejected | N/A |
| 003 | Stevo Kecman | Unpaid Bank Check | $2,000.00 | Accepted | $2,000.00 |
| 004 | Gospova Kecman | Unpaid Bank Check | $2,000.00 | Accepted | $2,000.00 |
| 005 | Vnesheconombank | Account Balance | $23,966.34 | Accepted | $23,966.34 |
| 006 | Arrowstrip Inc. | Letter of Credit | $107,051.94 | Rejected | N/A |
| 007 | Komercijalna Banka AD Beograd | Funds Transfer | $2,645,439.29 | Accepted | $2,645,439.29 |
| 008 | JUBMES banka a.d. Beograd | Account Balance | $2,113,559.40 | Accepted | $2,113,559.40 |
| 009 | Jyske Bank A/S | Funds Transfer | $13,000.00 | Rejected | N/A |
| 010 | Energoprojekt Industrija a.d. | Account Balance | $11,482.02 | Accepted | $11,482.02 |
| 011 | Zorka Jednak | Account Balance | DEM 4,514.25 | Rejected | N/A |
| 012 | Energoprojekt Hidroinzenjering a.d. | Account Balance | CHF 2,629.97 | Accepted | CHF 2,629.97 |
| 013 | Energoprojekt Hidroinzenjering a.d. | Account Balance | $200,000.00 | Accepted | $200,000.00 |
| 014 | Energoprojekt Hidroinzenjering a.d. | Account Balance | $238,078.36 | Accepted | $238,078.36 |
| 015 | Energoprojekt Hidroinzenjering a.d. | Account Balance | $400,000.00 | Rejected | N/A |
| 016(a) | Energoprojekt Visokogradnja a.d | Account Balance | $2,114,932.98 CHF 507,920.43 FRF 1,239,624.62 | Accepted | $2,002,932.98 CHF 507,920.43 FRF 1,239,624.62 |
| 016(b) | Energoprojekt Visokogradnja a.d. | Account Balance | $2,114,932.98 CHF 507,920.43 FRF 1,239,624.62 | Rejected | N/A |
| 017(a) | Energoprojekt Niskogradnja a.d. | Account Balance | $265,528.44 DEM 414.65 CHF 15,500.40 | Accepted | $62,028.44 DEM 414.65 CHF 15,500.40 |
| 017(b) | Energoprojekt Niskogradnja a.d. | Account Balance | $265,528.44 DEM 414.65 CHF 15,500.40 | Rejected | N/A |
| 018 | NIS a.d. Novi Sad | Letter of Credit | $2,759,442.70 | Accepted | $1,694,718.98 |
| 019 | Vanja (Radulovic) Jelovina | Account Balance | EUR 19,296.27 | Rejected | N/A |
| 020 | Sage Realty Corporation | Judgment Creditor | $6,327,352.00 | Accepted | $2,928,507.81 |
| 021 | Safete Luzha | Account balance | EUR 1,420.43 | Rejected | N/A |
| 022 | Hasan Damoni | Account balance | EUR 1,633.07 | Rejected | N/A |
| 023 | Zorka Jednak | Account Balance | DEM 997.62 | Rejected | N/A |
| 024 | Miomir Sterjoski | Account Balance | 137,879.80 Dinars | Rejected | N/A |
| 025 | Adam Dabek | Account Balance | DEM 10,328.94 | Rejected | N/A |
| 026 | Zagrebacka banka, d.d. | Account Balance | $3,000,000.00 | Accepted | $3,000,000.00 |
| 027 | Zagrebacka banka, d.d. | Account Balance | $60,307.53 | Accepted | $60,307.53 |
| 028 | Todorovska Marija | Account balance | EUR 1,739.59 | Rejected | N/A |
| 029 | Eva Slotala | Account Balance | DEM 10,328.94 | Rejected | N/A |
| 030 | National Bank of Serbia | Account Balance | $8,829,556.87 | Accepted | $8,829,556.87 |
| 031 | National Bank of Serbia | Account Balance | $284,980.00 | Accepted | $284,980.00 |
| 032 | National Bank of Serbia | Account Balance | $25,965,061.59 | Accepted | $25,965,061.59 |
| 033(a) | National Bank of Serbia | Account Balance | $13,577,159.49 | Accepted | $13,463,189.85 |
| 033(b) | National Bank of Serbia | Account Balance | $13,577,159.49 | Rejected | N/A |
| 034 | National Bank of Serbia | Account Balance | $3,108,940.93 | Accepted | $3,108,940.93 |
| 035(a) | National Bank of Serbia | Account Balance | 23,420,760.05 | Accepted | DEM 22,983,906.22 |
| 035(b) | National Bank of Serbia | Account Balance | 23,420,760.05 | Rejected | N/A |
| 036(a) | National Bank of Serbia | Account Balance | $20,769,764.40 | Accepted | $20,600,528.34 |
| 036(b) | National Bank of Serbia | Account Balance | $20,769,764.40 | Rejected | N/A |
| 037 | Huntington National Bank | Funds Transfer | $3,000.00 | Rejected | |
| 038 | Unicredit Bank A.D. | Account Balance | $197,531.22 | Accepted | $98,765.51 |

October 22, 2012

# List of Accepted and Rejected Claims Against Jugobanka New York Agency[1]

| Claim Number | Claimant Name | Nature of Claim | Claimed Amount | Determination | Principal Amount Accepted[2] |
|---|---|---|---|---|---|
| 039 | Abanka D.D. | Account Balance | $63,918.90 | Accepted | $63,918.90 |
| 040 | Marijan Pocrnja | Account Balance | $6,786.08 EUR 3,910.40 | Rejected | N/A |
| 041 | Beogradska Banka a.d. Beograd in bankruptcy | Account Balance | $1,200,000.00 | Accepted | $1,200,000.00 |
| 042 | Beogradska Banka a.d. Beograd in bankruptcy | Account Balance | $203,602.12 | Accepted | $203,602.12 |
| 043 | Rukija Damoni | Account Balance | DEM 1,330.59 | Rejected | N/A |
| 044 | Dusan D. Mladic (contact name) | Unstated | Unstated | Rejected | N/A |
| 045 | National Bank of Serbia | Account Balance | $10,219.86 | Accepted | $10,219.86 |
| 046 | National Bank of Serbia | Account Balance | $26,458.25 | Accepted | $26,458.25 |
| 047 | Jugoslavenska banka a.d. Beograd (in bankruptcy) | Account Balance | $1,458.09 | Accepted | $1,458.09 |
| 048 | Stopanska Banka A.D. | Funds Transfer | $126,145.14 | Rejected | N/A |
| 049 | National Employment Service | Account Balance | $24,003.09 | Accepted | $24,003.09 |
| 050 | Ministry of Foreign Affairs of the Republic of Serbia | Account Balance | $25,487.93 | Accepted | $25,487.93 |
| 051 | Ministry of Foreign Affairs of the Republic of Serbia | Account Balance | $33,574.43 | Accepted | $33,574.43 |
| 052 | Ministry of Foreign Affairs of the Republic of Serbia | Account Balance | $1,530.73 | Accepted | $1,530.73 |
| 053 | Ministry of Foreign Affairs of the Republic of Serbia | Account Balance | $33,736.38 | Accepted | $33,736.38 |
| 054 | Ministry of Foreign Affairs of the Republic of Serbia | Account Balance | $5,354.27 | Accepted | $5,354.27 |
| 055 | Ministry of Foreign Affairs of the Republic of Serbia | Account Balance | $22,245.97 | Accepted | $22,245.97 |
| 056 | Ministry of Foreign Affairs of the Republic of Serbia | Account Balance | $13,820.30 | Accepted | $13,820.30 |
| 057 | Ministry of Foreign Affairs of the Republic of Serbia | Account Balance | $20,398.46 | Accepted | $20,398.46 |
| 058 | Ministry of Foreign Affairs of the Republic of Serbia | Account Balance | $32,467.04 | Rejected | N/A |
| 059 | Ministry of Foreign Affairs of the Republic of Serbia | Account Balance | $33,773.16 | Accepted | $33,773.16 |
| 060 | Ministry of Foreign Affairs of the Republic of Serbia | Account Balance | $30,615.81 | Accepted | $30,615.81 |
| 061 | Ministry of Foreign Affairs of the Republic of Serbia | Account Balance | $6,231.62 | Rejected | N/A |
| 062 | Ministry of Foreign Affairs of the Republic of Serbia | Account Balance | $9,786.53 | Accepted | $9,786.53 |
| 063 | Paklar Zoran | Bonds | 52,800,000 Dinars | Rejected | N/A |
| 064 | Ministry of Foreign Affairs of the Republic of Serbia | Account Balance | $24,669.59 | Accepted | $24,669.59 |
| 065 | Vamimontalum MM | Account Balance | $455,719.25 | Accepted | $83,739.11 |
| 066 | Teresa Ogiermann | Account Balance | DEM 10,328.94 | Rejected | N/A |
| 067(a) | Privredna Banka Sarajevo DD Sarajevo | Account Balance | $3,117,987.13 | Accepted | $3,017,256.15 |
| 067(b) | Privredna Banka Sarajevo DD Sarajevo | Account Balance | $3,117,987.13 | Rejected | N/A |
| 068 | Ina-Industrija Nafte, d.d | Account Balance | $1,759,255.54 | Accepted | $1,759,255.54 |
| 069 | Erste Bank ad Novi Sad | Account Balance | $132,880.59 | Accepted | $132,880.59 |
| 070 | Brankica Herzog | Account Balance | DEM 4,147.59 | Rejected | N/A |

October 22, 2012

# List of Accepted and Rejected Claims Against Jugobanka New York Agency[1]

| Claim Number | Claimant Name | Nature of Claim | Claimed Amount | Determination | Principal Amount Accepted[2] |
|---|---|---|---|---|---|
| 071 | Jugoslovenska banka a.d. Beograd (in bankruptcy) | Account Balance | $1,458.09 | Rejected | N/A |
| 072 | Beogradska Banka a.d. Beograd in bankruptcy | Account Balance | $1,200,000.00 | Rejected | N/A |
| 073 | Beogradska Banka a.d. Beograd in bankruptcy | Account Balance | $203,602.12 | Rejected | N/A |
| 074 | Jugoslavenska banka a.d. Beograd (in Bankruptcy) | Account Balance | $1,458.09 | Rejected | N/A |
| 075 | Beogradska Banka a.d. Beograd in bankruptcy | Account Balance | $203,602.12 | Rejected | N/A |
| 076 | Ina-Industrija Nafte, d.d | Account Balance | $1,759,255.54 | Rejected | N/A |
| 077 | Ina-Industrija Nafte, d.d | Account Balance | $1,759,255.54 | Rejected | N/A |
| 078 | Beogradska Banka a.d. Beograd in bankruptcy | Account Balance | $1,200,000.00 | Rejected | N/A |
| 079 | Adria Bank Aktiengesellschaft | Account Balance | EUR 215,138.5 | Accepted | EUR 166,608.64 |
| 080 | Gordana Zeitz-Ceko | Account Balance | Unstated | Rejected | N/A |
| 081 | Gordana Zeitz-Ceko | Account Balance | Unstated | Rejected | N/A |
| 082 | Verica Petkovic | Funds Transfer | $14,700.00 | Rejected | N/A |
| 083 | John Walshe | Damages Claim | Unstated | Rejected | N/A |
| 084 | Premix d.o.o. | Judgment Creditor | $17,276.47 | Accepted | $17,276.47 |
| 085 | Olympic Committee of Serbia | Account Balance | $260,410.50 | Accepted | $260,410.50 |
| 086 | Vuckovic Gojko | Account Balance | DEM 19,368.40 | Rejected | N/A |
| 087 | Selmani Zeqir | Account Balance | Unstated | Rejected | N/A |
| 088 | Beogradska banka "Sabacka banka" a.d. Sabac | Loan Agreement | $266,666.66 | Rejected | N/A |
| 089 | AY Bank Limited | Account Balance | $13,287.54 | Accepted | $13,287.54 |
| 090 | John Walshe | Damages Claim | Unstated | Rejected | N/A |
| 091 | Vojvodjanska Banka a.d. Novi Sad | Account Balance | $3,184.38 | Accepted | $3,184.38 |
| 092 | Vojvodjanska Banka a.d. Novi Sad | Account Balance | $3,753.75 | Accepted | $3,753.75 |
| 093 | Inex AG Zurich | Account Balance | $1,286,404.10 | Accepted | $865,268.82 |

[1] This list is amended to include determinations for assigned claim numbers 089, 090, 091, 092 and 093 identified in the supplemental list of claims filed with the Court on July 26, 2012.

[2] Accepted amounts are determinations only as to the principal amount of the claim. The Superintendent has not determined whether interest, at the rate and for the period permitted by the New York Banking Law, can or will be paid. Interest may not be paid unless and until (1) the full amount of all accepted claims and (2) the expenses of liquidation have been paid.

October 22, 2012

# List of Accepted and Rejected Accounts Payable of Jugobanka New York Agency

| Payable Number | Account Payable | Nature of Debt | Payable Amount | Determination | Principal Amount Accepted |
|---|---|---|---|---|---|
| 001 | AT&T Credit-Global Information Solutions fka NCR Credit Corporation | Trade Creditor | $10,000.00 | Rejected | N/A |
| 002 | Dow Jones Telerate, Inc. | Trade Creditor | $11,492.38 | Rejected | N/A |
| 003 | Telerate Systems, Inc. VS | Trade Creditor | $1,754.00 | Rejected | N/A |

October 22, 2012

# EXHIBIT B

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

One Liberty Plaza
New York, NY 10006-1470
T: +1 212 225 2000
F: +1 212 225 3999

clearygottlieb.com

WASHINGTON, D.C. · PARIS · BRUSSELS · LONDON · MOSCOW
FRANKFURT · COLOGNE · ROME · MILAN · HONG KONG
BEIJING · BUENOS AIRES · SÃO PAULO · ABU DHABI · SEOUL

D: +1 212 225 2894
bmorag@cgsh.com

LAURENT ALPERT
VICTOR I LEWKOW
LESLIE N SILVERMAN
LEE C. BUCHHEIT
JAMES M PEASLEE
THOMAS J. MOLONEY
DAVID G. SABEL
JONATHAN I BLACKMAN
MICHAEL L RYAN
ROBERT P DAVIS
YARON Z. REICH
RICHARD S. LINCER
STEVEN G. HOROWITZ
JAMES A DUNCAN
STEVEN M. LOEB
CRAIG B BROD
EDWARD J. ROSEN
LAWRENCE B. FRIEDMAN
NICOLAS GRABAR
CHRISTOPHER E. AUSTIN
SETH GROSSHANDLER
HOWARD S. ZELBO
DAVID E BRODSKY
ARTHUR H. KOHN
RICHARD J. COOPER
JEFFREY S. LEWIS
PAUL J. SHIM
STEVEN L. WILNER
ERIKA W. NIJENHUIS
ANDRES DE LA CRUZ
DAVID C. LOPEZ
JAMES L BROMLEY
MICHAEL A. GERSTENZANG
LEWIS J. LIMAN
LEV L. DASSIN
NEIL Q. WHORISKEY
JORGE U. JUANTORENA
MICHAEL D WEINBERGER
DAVID LEINWAND

DIANA L WOLLMAN
JEFFREY A ROSENTHAL
ETHAN A. KLINGSBERG
MICHAEL D DAYAN
CARMINE D BOCCUZZI. JR.
JEFFREY D. KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J RAYMOND
SUNG K KANG
LEONARD C. JACOBY
SANDRA L. FLOW
FRANCISCO L CESTERO
FRANCESCA L. ODELL
WILLIAM L. MCRAE
JASON FACTOR
MARGARET S. PEPONIS
LISA M SCHWEITZER
JUAN G GIRALDEZ
DUANE MCLAUGHLIN
BREON S. PEACE
MEREDITH E. KOTLER
CHANTAL E. KORDULA
BENET J. O'REILLY
ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P MCGRORY
MATTHEW P. SALERNO
MICHAEL J. ALBANO
VICTOR L. HOU
ROGER A COOPER
AMY R SHAPIRO
JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A. BAREFOOT
PAMELA L. MARCOGLIESE
PAUL M. TIGER
JONATHAN S. KOLODNER
DANIEL ILAN
MEYER H FEDIDA

ADRIAN R. LEIPSIC
ELIZABETH VICENS
ADAM BRENNEMAN
ARI D. MACKINNON
JAMES E. LANGSTON
JARED GERBER
COLIN D. LLOYD
COREY M. GOODMAN
RISHI ZUTSHI
JANE VANLARE
RESIDENT PARTNERS

SANDRA M. ROCKS
S. DOUGLAS BORISKY
JUDITH KASSEL
DAVID E. WEBB
PENELOPE L CHRISTOPHOROU
BOAZ S. MORAG
MARY E. ALCOCK
DAVID H. HERRINGTON
HEIDE H. ILGENFRITZ
HUGH C. CONROY, JR.
KATHLEEN M. EMBERGER
WALLACE L. LARSON, JR.
AVRAM E. LUFT
ANDREW WEAVER
HELENA K. GRANNIS
GRANT M. BINDER
JOHN V. HARRISON
CAROLINE F. HAYDAY
RAHUL MUKHI
NEIL R. MARKEL
HUMAYUN KHALID
RESIDENT COUNSEL

LOUISE M PARENT
OF COUNSEL

September 13, 2016

<u>VIA EMAIL AND FIRST CLASS MAIL</u>

John McCarthy, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004

Re: Distributions in the Liquidation Proceedings of Jugobanka A.D., Beograd
     <u>New York Agency and Beogradska Banka A.D., Beograd New York Agency</u>

Dear Mr. McCarthy:

At your request, I write to provide a more user-friendly version of the Distribution Instructions of the National Bank of Serbia dated March 7, 2016 (the "Distribution Instructions"). The Distribution Instructions set forth the amount to be paid to Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb") and the respective percentages of the remaining funds to be distributed to the Successor States to the former Socialist Federal Republic of Yugoslavia, as well as Montenegro, on account of the pro rata share of the accepted claims in the liquidation proceedings of Jugobanka A.D., Beograd New York Agency ("Jugobanka NY Agency") and Beogradska Banka A.D., Beograd New York Agency ("Beogradska Banka NY Agency") filed by the National Bank of Serbia ("NBS") to the deposit accounts in the name of the former National Bank of Yugoslavia (the "NBY Claims").

We are assuming that the distribution in respect of the accepted claims on the Jugobanka NY Agency will occur simultaneously with that of the Beogradska Banka NY Agency, but that the distributions are being conducted separately (i.e., a creditor of both agencies

John McCarthy, Esq., p. 2

will receive one distribution from Beogradska Banka NY Agency and a second distribution from the Jugobanka NY Agency).[1]

Accordingly, to effect the Distribution Instructions, the following steps should be followed:

1.      Calculate the total *pro rata* share in respect of the accepted NBY Claims on the Jugobanka NY Agency (Claim Numbers: 030, 031, 032, 033(a), 034, 035(a), and 036(a)) (the "**Jugobanka Distribution Amount**");

2.      Calculate the total *pro rata* share in respect of the accepted NBY Claims on the Beogradska Banka NY Agency (Claim Numbers: 018(a), 019, 020(a), 021, 022, and 023) (the "**Beogradska** Banka **Distribution Amount**");

3.      From the **Jugobanka Distribution Amount**, wire the total sum of **$152,000.00** (the "Fee Amount") to **Cleary Gottlieb** using the wiring instructions contained in the Distribution Instructions and reproduced in Appendix A hereto.  The Jugobanka Distribution Amount less the Fee Amount is referred to as the "**Jugobanka Distribution Balance**".

4.      The **Jugobanka Distribution Balance** is to be distributed as follows per the wiring instructions in the Distribution Instructions and in Appendix A:

| 1. | **15.5000%** of the Jugobanka Distribution Balance | **Bosnia and Herzegovina** |
|----|----|----|
| 2. | **23.0000%** of the Jugobanka Distribution Balance | **Republic of Croatia** |
| 3. | **07.5000%** of the Jugobanka Distribution Balance | **Republic of Macedonia** |
| 4. | **16.0000%** of the Jugobanka Distribution Balance | **Republic of Slovenia** |
| 5. | **35.7656%** of the Jugobanka Distribution Balance | **Republic of Serbia** |
| 6. | **02.2344%** of the Jugobanka Distribution Balance | **Montenegro** |

---

[1]      In the event the Jugobanka NY Agency distribution is not occurring simultaneously with the Beogradska Banka NY Agency distribution, the total Fee Amount should be paid from whichever distribution occurs first.  If the Jugobanka NY Agency distribution occurs first, the total Fee Amount should be paid from the Jugobanka Distribution Amount, with the balance (i.e., the Jugobanka Distribution Amount less the Fee Amount) being distributed in accordance with the percentages set out in paragraph 4.  If the Beogradska Banka NY Agency distribution occurs first, the total Fee Amount should be paid from the Beogradska Banka Distribution Amount, with the balance (*i.e.*, the Beogradska Banka Distribution Amount less the Fee Amount) being distributed in accordance with the percentages set out in paragraph 5.

John McCarthy, Esq., p. 3

      5.     The **Beogradska Banka Distribution Amount** is to be distributed as follows per the wiring instructions in the Distribution Instructions and in Appendix A:

| | | |
|---|---|---|
| 1. | **15.5000%** of the Beogradska Banka Distribution Amount | **Bosnia and Herzegovina** |
| 2. | **23.0000%** of the Beogradska Banka Distribution Amount | **Republic of Croatia** |
| 3. | **07.5000%** of the Beogradska Banka Distribution Amount | **Republic of Macedonia** |
| 4. | **16.0000%** of the Beogradska Banka Distribution Amount | **Republic of Slovenia** |
| 5. | **35.7656%** of the Beogradska Banka Distribution Amount | **Republic of Serbia** |
| 6. | **02.2344%** of the Beogradska Banka Distribution Amount | **Montenegro** |

Please feel free to call me with any questions.

Sincerely,

Boaz S. Morag

cc: Svetlana Bajić

John McCarthy, Esq., p. 4

## APPENDIX A

### WIRING INSTRUCTIONS

| Party | Amount or Percentage | Wiring Instructions |
|---|---|---|
| Cleary Gottlieb Steen & Hamilton LLP | $152,000.00 | Citibank, N.A.<br>ABA # 021000089<br>SWIFT Code # CITIUS33<br>Account Name:  Cleary Gottlieb Steen & Hamilton LLP<br>Account #40581508<br>Reference: 28512-017 |
| Bosnia & Herzegovina | 15.5000% | SWIFT-BIC:      DEUTDEFF<br>Name:            DEUTSCHE BANK AG<br>City, Country:      FRANKFURT AM MAIN,  GERMANY<br>Account with Institution/Beneficiary's Bank<br>SWIFT-BIC:         CBBSBA22<br>IBAN/Account Number:  DE81 5007 0010 0935 9621 00<br>Name:              CENTRALNA BANKA<br>                 BOSNE I HERCEGOVINE<br>Address:          MARSALA TITA 25<br>City, Country        SARAJEVO, BOSNIA AND<br>                 HERZEGOVINA<br><br>Beneficiary<br>IBAN:              BA390000030000000145<br>Account reference:    062122<br>Name:             MINISTARSTVO FINANSIJA I<br>                 TREZORA BIH<br>Address:          TRG BIH 1<br>City, Country        SARAJEVO, BOSNIA AND<br>                 HERZEGOVINA<br>Correspondent bank for DEUTSCHE BANK AG F/M for USD payments is DEUTSCHE BANK TRUST COMPANY AMERICAS N/Y (SWIFT:  BKTRUS33, ABA: 021 001033) |
| Republic of Croatia | 23.0000% | Beneficiary: Ministarstvo financija Republike Hrvatske<br>                 Katančićeva 5, 10 000 ZAGREB<br>                 Croatia<br>Account Number: HR56 1001 0051 8100 0002 3<br>Account with: HRVATSKA NARODNA BANKA<br>SWIFT BIC: NBHRHR2X<br><br>Correspondent bank: THE BANK OF NEW YORK MELLON, NEW YORK<br>SWIFT BIC: IRVTUS3N |

John McCarthy, Esq., p. 5

| Republic of Macedonia | 7.5000% | NATIONAL BANK OF THE REPUBLIC OF MACEDONIA<br><br>Address:    Bul."Kuzman Josifovski Pitu" br.1<br>              1000 Skopje MACEDONIA<br>SWIFT:       NBRM MK 2X<br><br>Final beneficiary: IBAN: MK07 1007 0100 0003 371<br>Name:          Ministerstvo za finansii<br><br>Correspondent bank: CITIBANK NA NEW YORK<br>Address:   111 Wall Street, New York, NY 10043<br>SWIFT BIC: CITI US 33 |
|---|---|---|
| Republic of Slovenia | 16.0000% | To the account of the Succession Fund of the Republic of Slovenia<br><br>IBAN SI56011006000016416<br>with the Bank of Slovenija<br>Slovenska 35, Ljubljana<br>(SWIFT CODE: BSLJSI2X)<br><br>The Bank of Slovenia has an account with the Citibank N.A., New York, SWIFT CODE: CITIUS33<br>Reference: Succession - NY Agencies |
| Republic of Serbia | 35.7656% | Account of:        National Bank of Serbia<br>With:              Deutsche Bank Trust Company<br>                     Americas, New York<br>SWIFT Address:     BKTRUS33<br>Number:            04415465<br>Reference:         Succession - NY Agencies |
| Montenegro | 2.2344% | Account with Institution:<br><br>FEDERAL RESERVE BANK OF NEW YORK<br><br>SWIFT BIC: FRNYUS33<br><br>Beneficiary Institution:<br><br>Acc. number: 021080669 MONTE<br><br>CENTRAL BANK OF MONTENEGRO<br><br>SWIFT BIC: CBCGMEPG |

# EXHIBIT C

**From:** McCarthy, John G. [mailto:McCarthyJ@sullcrom.com]
**Sent:** Tuesday, October 17, 2017 5:06 PM
**To:** Morag, Boaz S. <bmorag@cgsh.com>; Wagner, David E. <dwagner@cgsh.com>
**Cc:** Snipes, William J. <SnipesW@sullcrom.com>
**Subject:** Calculations of Proposed Payment Amounts for NBS Claims in Liquidations

Boaz and Dave,

Set forth below is the *pro rata* recovery amount of each of the National Bank of Serbia's accepted claims against the Jugobanka and Beogradska Banka agencies. As we have previously advised, the total amount of all claims accepted against the agencies exceeds the total amount of funds available to pay in full all accepted claims. The National Bank of Serbia's share of the available funds was calculated proportionately based on the agencies' total debt on accepted claims.

As previously agreed, the Superintendent's claims administrator will disburse those amounts in accordance with the instructions that the National Bank of Serbia has previously provided us (attached). Set forth below are the claims administrator's calculations of the amounts and parties to whom the National Bank of Serbia has instructed the Superintendent to disburse its *pro rata* share. Please confirm your agreement that the proposed payment amounts for each entity are correct.

### Jugobanka Agency

| Claim Number | Mailing Name Field 1 | Allowed Amount | Award Amount | Proposed Payment Amount |
|---|---|---|---|---|
| 36 | NATIONAL BANK OF SERBIA | $20,600,528.34 | $4,686,187.85 | |
| 35 | NATIONAL BANK OF SERBIA | $10,566,935.00 | $2,403,755.94 | |
| 34 | NATIONAL BANK OF SERBIA | $3,108,940.93 | $707,218.81 | |
| 33 | NATIONAL BANK OF SERBIA | $13,463,189.85 | $3,062,593.13 | |
| 32 | NATIONAL BANK OF SERBIA | $25,965,061.59 | $5,906,506.57 | |
| 31 | NATIONAL BANK OF SERBIA | $284,980.00 | $64,826.97 | |
| 30 | NATIONAL BANK OF SERBIA | $8,829,556.87 | $2,008,538.88 | |
| | CLEARY GOTTLIEB STEEN & HAMILTON LLP | | | $152,000.00 |
| | BOSNIA & HERZEGOVINA | | | $2,896,582.36 |
| | REPUBLIC OF CROATIA | | | $4,298,154.47 |
| | REPUBLIC OF MACEDONIA | | | $1,401,572.11 |
| | REPUBLIC OF SLOVENIA | | | $2,990,020.50 |
| | REPUBLIC OF SERBIA | | | $6,683,742.33 |
| | MONTENEGRO | | | $417,556.36 |
| **TOTAL:** | | **$103,585,562.00** | **$23,563,541.37** | **$23,563,541.35** |

### Beogradska Banka Agency

| Claim Number | Mailing Name Field 1 | Allowed Amount | Award Amount | Proposed Payment Amount |
|---|---|---|---|---|
| 18 | NATIONAL BANK OF SERBIA | $9,122,866.38 | $4,076,607.68 | |
| 19 | NATIONAL BANK OF SERBIA | $10,100,000.00 | $4,513,245.71 | |

| 20 | NATIONAL BANK OF SERBIA | $17,602,413.41 | $7,865,744.25 | |
|----|-------------------------|----------------|----------------|----------------|
| 23 | NATIONAL BANK OF SERBIA | $7,681,461.98 | $3,432,507.46 | |
| 21 | NATIONAL BANK OF SERBIA | $27,209,036.10 | $12,158,521.34 | |
| 22 | NATIONAL BANK OF SERBIA | $296,623.69 | $132,548.08 | |
| | BOSNIA & HERZEGOVINA | | | $4,987,772.05 |
| | REPUBLIC OF CROATIA | | | $7,401,210.14 |
| | REPUBLIC OF MACEDONIA | | | $2,413,438.09 |
| | REPUBLIC OF SLOVENIA | | | $5,148,667.92 |
| | REPUBLIC OF SERBIA | | | $11,509,074.84 |
| | MONTENEGRO | | | $719,011.48 |
| | | **$103,879,173.02** | **$46,419,032.91** | **$46,419,032.91** |

We look forward to hearing from you.

Best regards,

John G. McCarthy
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Tel. (212) 558-7867
Fax (212) 291-9589

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities.

This message is being sent from a law firm and may contain confidential or privileged information. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy.

Throughout this communication, "Cleary Gottlieb" and the "firm" refer to Cleary Gottlieb Steen & Hamilton LLP and its affiliated entities in certain jurisdictions, and the term "offices" includes offices of those affiliated entities

*Exh. D*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# JS-6

## CIVIL MINUTES – GENERAL

Case No.: 8:23-cv-01308-FWS-JDE                    Date: February 7, 2024
Title: Daniel Cavic v. Republic of Montenegro *et al.*

Present: **HONORABLE FRED W. SLAUGHTER, UNITED STATES DISTRICT JUDGE**

| Melissa H. Kunig | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

Attorneys Present for Plaintiff:                    Attorneys Present for Defendant:

Not Present                                        Not Present

## PROCEEDINGS: ORDER DISMISSING CASE FOR LACK OF SUBJECT MATTER JURISDICTION

### I. Background

On July 18, 2023, Plaintiff filed a Complaint alleging he had bank deposits in "Yugobanka, New York Agency" ("Yugobanka") and that Yugobanka was liquidated after the breakup of Yugoslavia. (Dkt. 1 ("Compl.") ¶¶ 5, 7.) Plaintiff alleges a federal district court in New York named Plaintiff as the first creditor in Yugobanka's liquidation case and awarded Plaintiff $1,064,211.12, comprised of his initial deposit of $31,273 with 10 percent interest compounded annually and attorney's fees. (*Id.* ¶¶ 9-10.) Plantiff alleges Defendants Republic of Montenegro, Republic of Serbia, Republic of Bosnia and Herzegovina, Republic of North Macedonia, Republic of Croatia, and Republic of Slovenia (collectively, "Defendants"), are successors to Yugoslavia's assets and liablities under the 2001 Succession Agreement of Former Yugoslavia ("2001 Succession Agreement") and are jointly and severally liable for the $1,064,211.12 due to Plaintiff. (*Id.* ¶¶ 5-6.) Plaintiff further alleges that Defendants have refused to pay Plaintiff the amounts owed to him and asserts breach of contract claims against each of the Defendants. (*Id.* ¶¶ 11, 46-54.)

On November 30, 2023, the court issued an Order to Show Cause why the action should not be dismissed for lack of subject matter jurisdiction ("OSC"). (Dkt. 40.) The court ordered

---

**CIVIL MINUTES – GENERAL**                                        1

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No.: 8:23-cv-01308-FWS-JDE                    Date: February 7, 2024
Title: Daniel Cavic v. Republic of Montenegro *et al.*

Plaintiff Daniel Cavic ("Plaintiff") to show cause in writing, no later than December 15, 2023, why the action should not be dismissed. (*Id.*) On December 12, 2023, Plaintiff filed a document entitled, "Request For 30 Days Continuance," requesting that the court continue the deadline to respond to the OSC. (Dkt. 41.) On December 26, 2023, the court granted Plaintiff's request and ordered Plaintiff to file a response to the OSC by January 22, 2024. (Dkt. 43.) On January 3, 2023, Plaintiff filed a "Reply" to the OSC. (Dkt. 44.)

## II.    Legal Standard

"Federal courts are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute." *Gunn v. Minton*, 568 U.S. 251, 257 (1994) (citation and internal quotation marks omitted). "Accordingly, 'the district courts may not exercise jurisdiction absent a statutory basis.'" *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1746 (2019) (quoting *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 552 (2005)). This threshold requirement "'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (quoting *Mansfield, C. & L.M. Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884); *see also Orient v. Linus Pauling Inst. of Sci. & Med.*, 936 F. Supp. 704, 706 (D. Ariz. 1996) ("Federal subject matter jurisdiction is a threshold issue that goes to the power of the court to hear the case, so subject matter jurisdiction must exist at the time the action commences."). Additionally, because subject matter jurisdiction is a threshold inquiry, a pleading must contain "a short and plain statement of the grounds for the court's jurisdiction." Fed. R. Civ. P. 8; *see also Harris v. Rand*, 682 F.3d 846, 850 (9th Cir. 2012) ("Under Federal Rule of Civil Procedure 8(a), a pleading must contain 'a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support.'").

"The basic statutory grants of federal-court subject-matter jurisdiction are contained in 28 U.S.C. § 1331, which provides for '[f]ederal-question' jurisdiction, and § 1332, which provides for '[d]iversity of citizenship' jurisdiction." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 501 (2006).

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No.: 8:23-cv-01308-FWS-JDE                    Date: February 7, 2024

Title: Daniel Cavic v. Republic of Montenegro *et al.*

"Federal question jurisdiction extends only in those cases in which a well-pleaded complaint establishes 'either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on a resolution of a substantial question of federal law.'" *Easton v. Crossland Mortg. Corp.*, 114 F.3d 979, 982 (9th Cir. 1997) (quoting *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 27-28 (1983)). However, "the mere reference of a federal statute in a pleading will not convert a state law claim into a federal cause of action if the federal statute is not a necessary element of the state law claim and no preemption exists." *Easton*, 114 F.3d at 982.

By contrast, diversity jurisdiction exists where a plaintiff demonstrates that: (1) the suit is between citizens of different states; and (2) the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332; *Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1090 (9th Cir. 2003) ("Jurisdiction founded on 28 U.S.C. § 1332 requires that the parties be in complete diversity and the amount in controversy exceed $75,000."). "Diversity jurisdiction requires complete diversity between the parties—each defendant must be a citizen of a different state from each plaintiff." *In re Digimarc Corp. Derivative Litig.*, 549 F.3d 1223, 1234 (9th Cir. 2008); *see also Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996).

Because courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party," *Arbaugh*, 546 U.S. at 514, "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action," Fed. R. Civ. P. 12(h)(3); *see also Arbaugh*, 546 U.S. at 514 ("The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment."). "While a party is entitled to notice and an opportunity to respond when a court contemplates dismissing a claim on the merits . . . it is not so when the dismissal is for lack of subject matter jurisdiction." *Scholastic Ent., Inc. v. Fox Ent. Grp., Inc.*, 336 F.3d 982, 985 (9th Cir. 2003); *see also Cal. Diversified Promotions, Inc. v. Musick*, 505 F.2d 278, 280 (9th Cir. 1974) ("It has long been held that a judge can dismiss sua sponte for lack of jurisdiction.").

CIVIL MINUTES – GENERAL                                                    3

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:23-cv-01308-FWS-JDE                    Date: February 7, 2024
Title: Daniel Cavic v. Republic of Montenegro *et al.*

## III.   Discussion

In the Reply, Plaintiff primarily argues that any jurisdictional issues are waived or moot pursuant to the 2001 Succession Argument and the Supreme Court's decision in *Türkiye Hall Bankasi A.S. v. United States*, 598 U.S. 264 (2023). (Reply at 2.)

The court finds the Reply has not sufficiently demonstrated a basis for the court's subject matter jurisdiction. As discussed in the OSC, the Foreign Sovereign Immunities Act ("FSIA") "is the exclusive source of subject matter jurisdiction over suits involving foreign states or their instrumentalities." *Joseph v. Off. of Consulate Gen. of Nigeria*, 830 F.2d 1018, 1021 (9th Cir. 1987). "Under the FSIA, [courts] presume that actions taken by foreign states or their instrumentalities are sovereign acts and thus are protected from the exercise of jurisdiction, unless one of the FSIA's exceptions to immunity applies." *Id.* FSIA's "statutory presumption that a foreign state is immune from suit" applies if the defendant makes a prima facie case that it is a foreign state or if "it is apparent from the pleadings or uncontested that the defendant is a foreign state." *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1124-25 (9th Cir. 2010) (citations omitted).

"Once the court has determined that the defendant is a foreign state, the burden of production shifts to the plaintiff to offer evidence that an exception applies." *Packsys, S.A. de C.V. v. Exportadora de Sal, S.A. de C.V.*, 899 F.3d 1081, 1087-88 (9th Cir. 2018) (quoting *Peterson*, 627 F.3d at 1125). "If the plaintiff satisfies [their] burden of production, jurisdiction exists unless the defendant demonstrates by a preponderance of the evidence that the claimed exception does not apply." *Id.* (quoting *Peterson*, 627 F.3d at 1125). As the Ninth Circuit explained:

> This burden-shifting scheme, which puts most of the weight on the plaintiff, is partly motivated by the fact that federal jurisdiction does not exist unless one of the exceptions to immunity from suit applies. *See* 28 U.S.C. § 1330; *Corzo v. Banco Central de Reserva del Peru,*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.: 8:23-cv-01308-FWS-JDE                    Date: February 7, 2024
Title: Daniel Cavic v. Republic of Montenegro *et al.*

243 F.3d 519, 522 (9th Cir. 2001). A court has a duty to assure itself of its own jurisdiction, regardless of whether jurisdiction is contested by the parties. *Rosson v. Fitzgerald,* 545 F.3d 764, 769 n.5 (9th Cir.2008). Therefore, "even if the foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity is unavailable." *Verlinden B.V. v. Cent. Bank of Nigeria,* 461 U.S. 480, 494 n.20, 103 S. Ct. 1962, 76 L. Ed. 2d 81 (1983); *see also Rep. of Austria v. Altmann,* 541 U.S. 677, 691, 124 S. Ct. 2240, 159 L. Ed. 2d 1 (2004). We cannot require a defendant to affirmatively plead foreign sovereign immunity from suit, since a court must decide immunity even if a defendant does not appear. It must fall to the plaintiff to prove that immunity does not exist.

*Peterson,* 627 F.3d at 1125.

In this case, it is apparent from the Complaint that each defendant is a foreign state such that Plaintiff bears the burden of demonstrating that a FSIA exception applies. *See id.* at 1128 ("[W]e require the defendant to make a prima facie case that it is a foreign state only when that fact is not obvious or uncontested.").

The court finds Plaintiff has not met his burden here. Plaintiff argues that the 2001 Succession Agreement demonstrates that Defendants waived their sovereign immunity. (*See, e.g.,* Reply at 1-2.) A foreign sovereign may waive the immunity protections of the FSIA "either explicitly or by implication." 28 U.S.C. § 1605(a)(1). "[T]he touchstone of the waiver exception remains the same: that the foreign state have *intended* to waive its sovereign immunity." *Ivanenko v. Yanukovich,* 995 F.3d 232, 240 (D.C. Cir. 2021) (internal citation and quotation marks omitted). Courts will "rarely" find waiver "without *strong evidence* that this is what the foreign state *intended.*" *Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect,* 89 F.3d 650, 655 (9th Cir. 1996), *as amended on denial of reh'g* (Aug. 28, 1996) (citations omitted).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.: 8:23-cv-01308-FWS-JDE                    Date: February 7, 2024
Title: Daniel Cavic v. Republic of Montenegro *et al.*

Although a foreign country may impliedly waive sovereign immunity by entering into a written agreement which "contemplates adjudication of a dispute by the United States courts," *Joseph*, 830 F.2d at 1023, "a mere contractual agreement between a foreign state and another party does not waive sovereign immunity," *Shamoun v. Republic of Iraq*, 441 F. Supp. 3d 976, 1000 (S.D. Cal. 2020) (citing *Joseph*, 830 F.2d at 1022). Instead, "a sovereign party has waived immunity where a contract *specifically* states that the laws of a jurisdiction within the United States are to govern the transaction," *Packsys*, 899 F.3d at 1093 (quoting *Joseph*, 830 F.2d at 1022), or where there is "a direct connection between the sovereign's activities in U.S. courts and the plaintiff's claims for relief." *In re Est. of Ferdinand Marcos Human Rights Litig.*, 94 F.3d 539, 547 (9th Cir. 1996).

Here, Plaintiff has not proferred adequate evidence or argument demonstrating either that Defendants "contemplated the involvement of United States courts," in the 2001 Sucession Agreement, *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 721 (9th Cir. 1992), or that Defendants' activities in United States courts are directly connected to Plaintiff's breach of contract claim. Accordingly, the court concludes Plaintiff has not demonstrated that 2001 Succession Agreement impliedly waived Defendants' sovereign immunity.

Nor does Plaintiff's citation to *Türkiye Hall Bankasi A.S. v. United States*, 598 U.S. 264 (2023) suggest another FSIA exception applies. In *Türkiye Hall*, the Supreme Court held that FSIA "does not provide foreign states and their instrumentalities with immunity from criminal proceedings." 598 U.S. at 280. But the Supreme Court simultaneously emphasized that FSIA "lays down a baseline principle of foreign sovereign immunity from *civil actions*," such as Plaintiff's breach of contract suit. *Id.* at 277 (quoting *Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 113 (2022)).

In sum, "courts must begin with the presumption that a foreign state is immune and then the plaintiff must prove that an exception to immunity applies." *Peterson*, 627 F.3d at 1125. Plaintiff has not demonstrated that an exception to FSIA immunity applies here. Therefore, the

**CIVIL MINUTES – GENERAL**                                                    6

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.: 8:23-cv-01308-FWS-JDE        Date: February 7, 2024

Title: Daniel Cavic v. Republic of Montenegro *et al.*

court concludes it lacks subject matter jurisdiction and **DISMISSES** this case **WITHOUT PREJUDICE AND WITHOUT LEAVE TO AMEND.** *See, e.g., Newpoint Fin. Corp. v. Bermuda Monetary Auth.,* --- F. Supp. 3d ----, 2023 WL 5505907, at *11 (C.D. Cal. 2023) (dismissing claims against foreign entity without leave to amend "where is no set of facts which could be alleged to show that the [the foreign entity] waived its sovereign immunity").

**IT IS SO ORDERED.**

Initials of Deputy Clerk: mku

---

*EXH. E*



**REPUBLIKA**
**SLOVENIJA**
**O K R O Ž N O**
**S O D I Š Č E**

LJUBLJANA



I R 398/2021

# SKLEP

Okrožno sodišče v Ljubljani je po okrožni sodnici Miheli Mohorič,

v nepravdni zadevi predlagatelja: **DANIEL ČAVIĆ**, 611 N. Rose Drive F 213, Placentia, 92870 California, ZDA, ki ga zastopa Rok Križanec, odvetnik v Ljubljani, zoper nasprotnega udeleženca: **YUGOBANKA**, 125 Broad Street, New York, NY 10004-2498,

v postopku priznanja tuje sodne odločbe,

dne **29. julija 2022**



## SKLENILO:

Predlog predlagatelja za priznanje tuje sodne odločbe se zavrže.

## OBRAZLOŽITEV:

1. Predlagatelj je pri naslovnem sodišču dne 20. 5. 2021 vložil predlog za priznanje tuje sodne odločbe – sodbe Vrhovnega sodišča države Kalifornija št. 30-2019-01055993-CL-UD-CJC z dne 2. 12. 2019.

2. Priznanje in izvršitev tujih odločb ureja Zakon o mednarodnem zasebnem pravu in postopku[1] v določbah od 94. do 111. člena. ZMZPP v 4. členu določa, da se ta zakon ne uporablja za razmerja, ki so urejena v drugem zakonu ali mednarodni pogodbi. Priznanje in izvršitev sodnih odločb med Republiko Slovenijo in Združenimi državami Amerike ni urejeno niti z drugim zakonom, niti z mednarodno pogodbo, vsled česar je v predmetnem postopku potrebno uporabiti neposredno določbe ZMZPP. V skladu z določbo 111. člena ZMZPP se za vprašanja, ki niso posebej urejena v ZMZPP, smiselno uporabljajo določbe Zakona o nepravdnem postopku (v nadaljevanju ZNP-1), v skladu z določbo 42. člena ZNP-1 pa se za vprašanja, ki niso urejena v ZNP-1, smiselno uporabljajo določbe Zakona o pravdnem postopku (v nadaljevanju ZPP).

3. Vložnik zahteve za priznanje mora predlogu za priznanje tuje sodne odločbe priložiti tujo sodno odločbo ali njen overjen prepis in predložiti potrdilo pristojnega tujega sodišča oziroma drugega organa o pravnomočnosti te odločbe po pravu države, v kateri je bila izdana (prvi odstavek 95. člena ZMZPP). Če tuja sodna odločba ali njen overjen prepis nista sestavljena v jeziku, ki je pri sodišču v uradni rabi, mora stranka, ki zahteva priznanje, predložiti tudi overjen prevod tuje sodne odločbe v jezik, ki je pri sodišču v uradni rabi (drugi odstavek 95. člena ZMZPP).

4. Predlog predlagatelja za priznanje tuje sodne odločbe ni bil popoln[2], zato ga je sodišče s sklepom z dne 12. 4. 2022 pozvalo, da v roku 45 dni od prejema sklepa svoj predlog dopolni, in sicer tako, da (med drugim) predloži: 1) potrdilo pristojnega tujega sodišča o pravnomočnosti odločbe, katere priznanje se zahteva, po pravu države, v kateri je bila izdana, in prevod potrdila o

---

[1] Ur. l. RS, št. 56/99 in sledeči, v nadaljevanju ZMZPP.

[2] Predlagatelj med drugim ni predložil potrdila pristojnega tujega sodišča o pravnomočnosti odločbe, katere priznanje zahteva v predmetnem postopku, po pravu države, v kateri je bila izdana ter overjen prevod potrdila o pravnomočnosti odločbe v slovenski jezik. Prav tako je predlagatelj predlogu priložil le kopijo prevoda tuje sodne odločbe v slovenski jezik, kar ne zadostuje zahtevam iz prvega odstavka 95. člena ZMZPP.

pravnomočnosti v slovenski jezik, ter 2) predloži overjen prevod odločbe, katere priznanje se zahteva.

5. Predlagatelj je dne 4. 5. 2022 vložil vlogo, v kateri je navedel, da ne more predložiti zahtevanega potrdila o pravnomočnosti, ker se le-to v skladu s pravom Združenih držav Amerike ne izdaja. Po predpisih države Kalifornija je namreč v primeru, ko stranka ne vloži pritožbe, sodba pravnomočna od trenutka, ko je izrečena oz. podpisana s strani dodeljenega sodnika. V dokaz svojih trditev je predlagatelj predložil „potek zadeve z dne 5. 5. 2020" (priloga A9), iz katerega naj bi bilo razvidno, da pritožba na sodišče ni bila vložena.

6. Po vpogledu v omenjeno prilogo sodišče ugotavlja, da je ta sestavljena v angleškem jeziku. Sodišče ponovno opozarja, da se v predmetnem postopku smiselno uporabljajo določbe ZPP, ki v 104. členu določa, da stranke vlagajo sodišču vloge v slovenskem jeziku ali v jeziku narodne skupnosti, ki je pri sodišču v uradni rabi. Predlagatelj tako v postavljenem roku ni predložil potrdila pristojnega tujega organa o pravnomočnosti tuje sodne odločbe, katere priznanje zahteva, niti ni (ustrezno) izkazal, da se takšno potrdilo v tuji ne bi izdajalo.

7. Dalje sodišče ugotavlja, da je predlagatelj vlogi z dne 4. 5. 2022 sicer predložil overjen prevod tuje odločbe, katere priznanje zahteva (priloga A6), ki pa je sestavljen v tujem (srbskem) jeziku.

8. Rok za predložitev listin se je v konkretnem primeru iztekel z dnem 6. 6. 2022.[3] Predlagatelj do izteka navedenega roka ni predložil niti potrdila pristojnega tujega sodišča oziroma drugega organa o pravnomočnosti te odločbe niti overjenega prevoda tuje sodne odločbe v jeziku, ki je pri sodišču v uradni rabi. Ker predlog za priznanje tuje sodne odločbe s strani predlagatelja v postavljenem roku ni bil dopolnjen v skladu z navodili sodišča, ga je bilo potrebno zavreči (peti odstavek 108. člena ZPP), kot izhaja iz izreka tega sklepa.

## PRAVNI POUK:

Zoper ta sklep je dopustna pritožba v roku 15 dni od dneva prejema pisnega odpravka. Pritožba se vloži pisno pri tem sodišču, v dveh izvodih. O pritožbi bo odločalo Višje sodišče v Ljubljani. Pritožba mora vsebovati navedbo sklepa, zoper katerega se vlaga, izjavo, da se sklep izpodbija v celoti ali v določenem delu, pritožbene razloge in podpis pritožnika. Če je pritožba nerazumljiva ali ne vsebuje vsega, kar je treba, da bi se lahko obravnavala, jo sodišče zavrže, ne da bi pozvalo vložnika, da jo popravi ali dopolni. Ob vložitvi pritožbe mora biti plačana sodna taksa. Če sodna taksa ni plačana niti v roku, ki ga določi sodišče v nalogu za njeno plačilo in tudi niso podani pogoji za oprostitev, odlog ali obročno plačilo

---

3 Sklep na dopolnitev predloga je bil predlagatelju vročen dne 21. 4. 2022 (vročilnica, pripeta k list. št. 26).

3/4



sodne takse, se šteje, da je pritožba umaknjena. V primeru, da stranka vloži pritožbo po pooblaščencu, mora biti ta odvetnik ali druga oseba, ki je opravila pravniški državni izpit, sicer bo sodišče pritožbo zavrglo.

Ljubljana, 29. julija 2022

Okrožna sodnica:

Mihela Mohorič, l.r.



Ta prepis je soglasen z izvirnikom

Podpis pristojne
sodne osebe:



**Okrožno sodišče v Ljubljani**
**Tavčarjeva 9**
**1000 Ljubljana**

Opr. št. I R 398/2021

# PLAČILNI NALOG

### za plačilo sodne takse

DANIEL ČAVIĆ,
611 N. Rose Drive F 213, Placentia,
USA 92870 CALIFORNIA, ZDA ZDA

| Sodnica | Mihela Mohorič |
|---|---|

| Predlagatelj | pooblaščenci in zastopniki |
|---|---|
| 1. DANIEL ČAVIĆ, 611 N. Rose Drive F 213, Placentia, 92870 CALIFORNIA, ZDA | |

| Nasprotni udeleženec | pooblaščenci in zastopniki |
|---|---|
| 1. YUGOBANKA A.D., Predstavništvo v New Yorku, nn, nn | |

| zaradi: | priznanje tuje sodne odločbe, ZDA - Kalifornija, št. 30-2019-01055993 (plačilo) |
|---|---|
| vrednost: | |

Na podlagi 34. člena Zakona o sodnih taksah - ZST-1 vas pozivamo, da v 15 dneh od vročitve tega naloga plačate neplačano oziroma premalo plačano sodno takso za

postopek o predlogu za priznanje tuje sodne odločbe po tarifni številki 30011 ZST-1 v znesku 16,00 EUR.

Sodne takse se plačujejo v gotovini, z elektronskim denarjem ali drugimi veljavnimi plačilnimi sredstvi (1. odstavek 6. člena ZST-1).

Če plačilo sodne takse opravite z nakazilom na prehodni podračun tega sodišča, določen za plačevanje sodnih taks, v obrazcu univerzalnega plačilnega naloga (obrazec UPN) navedite naslednje podatke:
- koda namena plačila: GOVT,
- namen plačila: I R 398/2021,
- BIC banke prejemnika: BSLJSI2X,
- IBAN: SI56 0110 0845 0084 126,
- referenca: SI11 42188-7110006-10039821,
- ime in naslov prejemnika: Okrožno sodišče v Ljubljani, Tavčarjeva 9, 1000 Ljubljana.

Če plačilo sodne takse opravite brez reference, ki je navedena v tem plačilnem nalogu, morate sodišču predložiti potrdilo o opravljenem plačilu (3. odstavek 6. člena ZST-1) do izteka roka, določenega v prvem odstavku tega plačilnega naloga.

Šteje se, da je sodna taksa plačana na dan, ko je denarno nakazilo prejeto v dobro prehodnega podračuna sodišča (1. odstavek 6.a člena ZST-1), če pa sodišču dostavite dokazilo o plačilu takse pred pretekom roka, določenega v prvem odstavku tega plačilnega naloga, se šteje, da je taksa plačana na dan, ko sodišče prejme dokazilo o plačilu, ne glede na to, kdaj je denarno nakazilo prejeto v dobro prehodnega podračuna sodišča (3. odstavek 6.a člena ZST-1).

Pri plačilu sodne takse prek ponudnika plačilnih storitev se šteje, da je taksa plačana v roku iz prvega odstavka tega plačilnega naloga, če je denarno nakazilo prejeto v dobro prehodnega podračuna tega sodišča v treh delovnih dneh po izteku tega roka, razen če dostavite sodišču dokazilo o plačilu takse pred potekom roka iz prvega odstavka plačilnega naloga. Tedaj se šteje, da je taksa plačana pravočasno ne glede na to, kdaj je denarno nakazilo prejeto v dobro prehodnega podračuna tega sodišča (6.b člen ZST-1).

Če se taksa plača pri blagajni sodišča, se šteje, da je plačana na dan plačila pri blagajni sodišča (2. odstavek 6.a člena ZST-1).

Če v danem roku sodne takse po tem nalogu ne boste plačali oziroma če v tem roku ne boste zaprosili za oprostitev, odlog ali njeno obročno plačilo, se bo v skladu s 3. odstavkom 105. a člena Zakona o pravdnem postopku štelo, da ste predlog za priznanje tuje sodne odločbe umaknili. V tem primeru boste morali plačati takso, ki je v tarifnem delu ZST-1 določena za umik te vloge oziroma če ta taksa v tarifnem delu ni določena, tretjino takse za postopek o tej vlogi (4. odstavek 34. člena ZST-1).

**Pravni pouk:** Zoper ta plačilni nalog je dopustno v osmih dneh od vročitve vložiti ugovor iz razlogov, da taksna obveznost ni nastala, da je taksa že plačana ali da je sodišče takso napačno odmerilo.

Ugovoru, vloženemu iz razloga, da je taksa že plačana, je treba priložiti potrdilo o opravljenem plačilu.

O ugovoru odloča to sodišče.

Če sodišče ugovoru zoper ta plačilni nalog ali pritožbi zoper sklep o ugovoru ne bo ugodilo, bo začel teči rok za plačilo naslednji dan po vročitvi sklepa (7. odstavek 34. a člena ZST-1)

**Okrožno sodišče v Ljubljani**
**Dne 31.05.2021**

Sodnica

Mihela Mohorič l.r.
okrožna sodnica

**Po odredbi sodnika-ce**
Podpis pristojne
sodne osebe:

I R 398/2021         Nal_34a_1_d7         2

(No Subject)                    *TRANSLATION -SLOVENIA*

From:  Marijana Lucic (lucicmarijana428@gmail.com)

To:    cavic.danny@yahoo.com

Date:  Thursday, February 17, 2022, 07:34 AM PST

2/17/2022

PgDr

REPUBLIC

SLOVENIA

DISTRICT

THE COURT

LJUBLJANA

Ent

SuNp 49/2021

CONCLUSION

The President of the District Court in Ljubljana, Senior Judge Marjan Pogačnik, on the supervisory appeal of the applicant: DANIEL ČAVIĆ, 611 N. Rose Drive F 213, Placentia, California, USA, dated 25 November 2021, 21 December 2021

HAS DECIDED AS FOLLOWS:

Supervisory appeal in the case of opr. no. IR 398/2021 is rejected.

EXPLANATORY STATEMENT:

1. The petitioner Daniel Čavić, 611 N. Rose Drive F 213, Placentia, California, USA, on 25 November 2021 at the local court in the case ref. no. I R 398/2021 lodged an application which, having regard to its content, the Court considered to be a supervisory appeal. In his supervisory appeal, he states that he has filed a motion for recognition of a foreign court decision. Six months have passed since the day the proposal was submitted, but the latter has not yet been decided. Such conduct of the court constitutes a violation of Article 6 of the European Convention on Human Rights, which stipulates, inter alia, that everyone has the right to have his or her rights and obligations decided within a reasonable time. Given that this is a simple legal matter, the procedure should have already been completed. The petitioner proposes that his supervisory appeal be upheld and that all necessary actions be taken to expedite the procedure.

2. The supervisory appeal is dismissed as unfounded.

3. In accordance with the provision of the third paragraph of Article 6 of the Protection of the Right to Trial Act without undue delay (hereinafter: ZVPSBNO), the President of the Court,

Sent from my iPhone

1/1

# (No Subject)

From:  Marijana Lucic (lucicmarijana428@gmail.com)

To:  cavic.danny@yahoo.com

Date:  Thursday, February 17, 2022, 07:35 AM PST

in order to assess the allegations in the supervisory appeal, requested a report from the panel

judges.

4. On the basis of the report of the trial judge and the report of the head of the litigation department, the president of the court finds that the proposal for recognition of a foreign court decision was submitted on 20 May 2021 to a court without substantive jurisdiction, the Ljubljana District Court. On 24 May 2021, the District Court in Ljubljana forwarded the proposal to the District Court in Ljubljana, which on 26 May 2021 conducted a formal examination of the proposal. On 31 May 2021, the court issued a payment order for the applicant to pay the court fee. As the applicant did not have a proxy at the time of the application, the court served the payment order directly on his address in the USA, as stated in the application. To date, the court has not received a return receipt stating when the petitioner received the payment order. Therefore, it was not possible to verify the timeliness of the payment of the court fee as a procedural precondition. On 25 August 2021, the court received a notification of authorization from the lawyer Rok Križanc and an unofficial confirmation of the payment of the court fee. As the payment of the court fee was not evident from the UJP-net, on 21 September 2021 the court forwarded a letter to the Financial Accounting Service of the address court (hereinafter: FRS), asking it to check whether the applicant had paid the court fee. On 28 September 2021, the court received a reply from the FRS stating that on 19 August 2021, an amount of EUR 16.00 had been paid to the transaction account of the court for court fees. The fee was paid by Trustly Gourp AB of Stockholm, which allows customers to pay from an online bank account. The FRS could not confirm whether the transaction was a payment ordered by the applicant. Namely, the mentioned company did not want to disclose this information to them due to the protection of personal data. It is not clear from the evidence provided by the applicant and the evidence received from the Ministry of Finance that the court fee due was paid by the applicant at all. According to the explanation, it will be necessary to first make an international inquiry at the post office about when the payment order was served on the applicant. If it is established that the court fee was paid on time and after receiving a complete proposal for the recognition of a foreign court decision, the court will be able to consider the content of the submitted proposal.

5. The President of the Court notes that the supervisory appeal is unfounded, as the above report does not show that the court in the case in question was delaying the trial. The matter is being dealt with on an ongoing basis. The stalemate in the proceedings, however, was due to reasons not on the side of the court. The case is expected to be closed after receiving a complete proposal for the recognition of a foreign court decision and all required annexes, or after determining the timeliness of payment of the court fee.

6. In the light of the findings presented, the President of the Court concludes that the supervisory appeal is unfounded. Therefore, in accordance with the fifth paragraph of Article 6 of the ZVPSBNO, he rejected the supervisory appeal.

Sent from my iPhone

## (No Subject)

From:  Marijana Lucic (lucicmarijana428@gmail.com)

To:      cavic.danny@yahoo.com

Date:  Thursday, February 17, 2022, 07:35 AM PST

LEGAL PRECEPT:

A forward motion against this decision may be filed with the local court within 15 days of receipt of this decision. It will be decided by the President of the High Court in Ljubljana.

Ljubljana, 21 December 2021

President of the Court Marjan Pogačnik Senior Judge

CLO

NO

S

V

RE

LJUBANI

Sent from my iPhone